UNION COUNTY JAIL INMATES, Timmie Lee Barlow, et al., Plaintiffs,

v.

James SCANLON, Thomas Jefferson, etc. et al., Defendants,

v.

William H. FAUVER, Commissioner, Department of Corrections, Third-Party Defendant.

Civ. No. 81–863.

United States District Court, D. New Jersey.

April 27, 1982.

Stanley C. Van Ness, New Jersey Public Defender by T. Gary Mitchell, Trenton, N. J., for plaintiffs.

Robert C. Doherty, County Counsel, County of Union, Elizabeth, N. J., for defendants.

Irwin I. Kimmelman, Atty. Gen. of New Jersey by Joseph T. Maloney, Deputy Atty. Gen., Trenton, N. J., for third-party defendant.

OPINION

HAROLD A. ACKERMAN, District Judge.

It is no secret that crime is one of the most serious problems facing this country.

People properly perceive it as a disease of epidemic proportions affecting the very well-being of society.[1] It is understandable that the public, acting through its appointed and elected representatives, has attempted to respond forcefully by apprehending, prosecuting, convicting, and in appropriate circumstances, incarcerating the perpetrators of crime.

Incarceration, especially for violent criminals, is increasingly considered to be the appropriate response to criminal behavior.[2] For this reason, the legislatures of many jurisdictions have reacted to this epidemic through the passage of new laws significantly stiffening penalties to be meted out to offenders and adjusting parole guidelines. New Jersey is no exception. The new criminal code has already had an appreciable impact on the number and length of incarcerative sentences.[3]

As an inevitable consequence of this war on crime, there has been an enormous increase in the population of correctional facilities in this country.[4] Again, New Jersey is no exception.[5] The erection of new correctional facilities to accommodate the increased jail and prison populations has been urged by many responsible leaders including Chief Justice Warren E. Burger.[6] To date, new construction has not kept pace with the demand for prison space.

 Institutions have become not just crowded but overcrowded. The reduced habitability of correctional facilities has in turn spawned a flood of lawsuits by prisoners in the federal courts.[7] The complaints alleging violations of the United States Constitution paint an egregious picture of the conditions of confinement in both state and federal institutions. The allegations

1. As reported by the Federal Bureau of Investigation, *Uniform Crime Reports: Crime in the United States*, September 10, 1981, at 38:

 The volume of Crime Index offenses in 1980 increased 18 percent over 1976 figures and 55 percent above those for 1971 .... From 1976 to 1980, violent crimes were up 33 percent and property crimes rose 16 percent.

2. One very able spokesperson for this viewpoint is James Q. Wilson, *Thinking About Crime*, 172–73 (1975):

 [W]e would view the correctional system as having a very different function—namely, to isolate and to punish. It is a measure of our confusion that such a statement will strike many enlightened readers today as cruel, even barbaric. It is not. It is merely a recognition that society at a minimum must be able to protect itself from dangerous offenders and to impose some costs (other than the stigma and inconvenience of an arrest and court appearance) on criminal acts; it is also a frank admission that society really does not know how to do much else.

 The purpose of isolating—or, more accurately, closely supervising—offenders is obvious: Whatever they may do when they are released, they cannot harm society while confined or closely supervised. The gains from merely incapacitating convicted criminals may be very large.... If much or most serious crime is committed by repeaters, separating repeaters from the rest of society, even for relatively brief periods of time, may produce major reductions in crime rates.

3. 23% more incarcerative sentences were imposed during the first six months of 1981 than during the comparable period in 1980. Steelman, "Overcrowding in New Jersey: No Easy Answers to a Crisis in Corrections", National Council on Crime & Delinquency 16 (1981).

4. The National Institute of Justice reports that the number of persons confined for more than one year increased almost 50% between 1972–1978. 2 National Institute of Justice, American Prisons and Jails 11 (1980).

5. The population projections for the New Jersey prison complex show an increase of 38% from 1981 to 1982, and an increase of 150% from 1981 to 1985. By January 1990, 14,400 persons could be populating the state facilities.

6. After society has spent years and often a modest fortune to put just one person behind bars, we become bored. The media lose interest and the individual is forgotten. Our humanitarian concern evaporates. In all but a minority of the States we confine the person in an overcrowded, understaffed institution with little or no library facilities, little if any educational program or vocational training. I have visited American prisons built more than 100 years ago for 800 prisoners, but with two thousand crowded today inside their ancient walls. Remarks of Warren E. Burger, Annual Report to the American Bar Association (Feb. 8, 1981).

7. *See Rhodes v. Chapman*, 452 U.S. 337, 354 n.2, 101 S.Ct. 2392, 2395 n.2, 69 L.Ed.2d 59 (1981) (Brennan, J. concurring) *citing* 3 National Institute of Justice, American Prisons and Jails 34 (1980).

implicate the Fifth and Fourteenth Amendments with respect to the confinement of those who stand accused but who are not free on bail (pretrial detainees). They raise Eighth and Fourteenth Amendment issues with respect to sentenced offenders. These amendments protect, respectively, pretrial detainees from subjection to punishment without due process, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and sentenced persons from subjection to cruel and unusual punishment, *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Courts, while being sensitive to the public desire to incarcerate criminals, must, when called upon, examine the conditions of incarceration because "people are sent to prison as punishment, not for punishment."[8]

This action involves the overcrowded conditions at the Union County Jail ("UCJ"). The plaintiffs, represented by the New Jersey Public Defender,[9] brought suit a year ago against the Union County officials who administer the UCJ (hereinafter referred to collectively as the "County").[10] The County, alleging that the overcrowded condition of the UCJ is caused in whole or in part by the refusal of the New Jersey Department of Corrections to remove those UCJ inmates who have been sentenced to state prison terms, has impleaded as a third-party defendant, William H. Fauver, Commissioner of the Department of Corrections. Everyone agrees that the UCJ is overcrowded.

The only issue in this case is whether the conditions in the jail have fallen below the standards constitutionally mandated. I find that they have.

### PROCEDURAL HISTORY

This case has taken a unique procedural path. On October 22, 1981, the Public Defender and the County submitted to the Court for its approval a stipulation of settlement which provided, *inter alia*, for a population cap in the UCJ of 238.[11] The settlement was approved and entered into the record as a consent judgment. The third-party defendant was not a party to that settlement. Subsequently, the County sought a preliminary injunction compelling the Commissioner to withdraw immediately those UCJ inmates sentenced to state prison terms in order to enable the County to comply with the settlement agreement. In response to the request, the Commissioner moved to vacate the consent judgment asserting that the County was without the authority to have entered into it under the terms of Governor Byrne's Executive Orders Nos. 106 and 108, dated June 19, 1981 and September 11, 1981. Those Executive Orders declared a state of emergency in the state prison system due to overcrowding, suspended the operation of *N.J.S.A.* 2C:43–10(e) which mandated the removal of state sentenced inmates within 15 days of sentencing, and granted to the Commissioner authority to designate the place of confinement of any state or county inmate.

8. N.Y. Times, Mar. 25, 1982, § A, at 16, col. 1, quoting Frank W. Wood, Warden of Minnesota Correctional Facility in Oak Park Heights.

9. The Office of Inmate Advocacy, counsel to the plaintiffs, was established as a part of the Office of the Public Defender. *N.J.S.A.* 52:27E-10. The Public Defender has discretion to decide what clients the Office of the Inmate Advocacy will represent. *N.J.S.A.* 52:27E–12.

10. The plaintiffs also included as defendants several judges of the New Jersey Superior Court. On August 5, 1981, the complaint was dismissed as against these defendants on the grounds that comity considerations precluded granting relief against judges who were not alleged to have directly and personally engaged in unconstitutional conduct. 519 F.Supp. 770 (D.N.J.1981).

11. The stipulation of settlement sets the maximum capacity of the jail at 238 and allows the County defendants 90 days in which to implement the agreement. The measures to be taken whenever the capacity is exceeded include notification to the county judiciary for review of bail status and sentences, notification to municipal police agencies for retention of persons presently confined in the local lock-up facilities, notification to the Department of Corrections for removal of state sentenced inmates, and notification to this Court for a hearing. Pending a determination or other action to reduce the population, the jail administrators were required to refuse to admit persons brought to them.

In order to avoid a potential confrontation between the state executive government and the federal judiciary, I stayed the hearing on the County's order to show cause and the Commissioner's motion to vacate the consent judgment. At that time, the appeal of a decision by the Appellate Division of the Superior Court of New Jersey upholding the Governor's orders was pending before the New Jersey Supreme Court. On January 6, 1982, the appeal was decided. *Worthington v. Fauver,* 88 N.J. 183, 440 A.2d 1128 (1982). In *Worthington,* Justice Pashman, writing for a unanimous court, held that the executive orders were a valid exercise of the power delegated to the Governor under the Civil Defense and Disaster Control Act. The Court also held that they did not violate the state constitutional doctrine of separation of powers, and that the Commissioner's action in designating the county jails as the place of confinement of state sentenced inmates currently housed there was not arbitrary or capricious.[12]

On January 20, 1982, counsel for all of the parties in this litigation were heard on the previously stayed motions, as well as on a motion made by the County to vacate the consent judgment, and on plaintiffs' motion that the County be found in contempt for failure to abide by the terms of the consent judgment. On January 29, 1982, I denied the third-party defendant's motion to vacate the consent order. Consideration of the other motions was deferred. At that time, I determined that a Special Master should be appointed pursuant to Fed.R. Civ.P. 53 to undertake a thorough examination of the conditions in the UCJ and to investigate the extent of the County's compliance with the consent judgment.[13] The Special Master, the Hon. Worrall F. Mountain, filed his report with the Court on February 26, 1982.[14] Objections were duly filed by the Commissioner and a hearing was held on March 25, 1982. I must now decide whether to accept, reject or modify the Special Master's report. Fed.R.Civ.P. 53(e)(2). For the reasons which I will articulate *infra,* I have determined that his findings of fact should be adopted. I will also accept, with certain specific modifications, the proposed conclusions of law. The remedy outlined by the Special Master will be followed in all material respects.

## FINDINGS OF FACT OF SPECIAL MASTER

■ Rule 53(e)(2) sets forth the standard of review to be applied to a master's findings of fact: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." *See also Kyriazi v. Western Electric Co.,* 647 F.2d 388, 396 (3d Cir. 1981). The findings of the Special Master therefore carry a presumption of correctness. The burden is on an objector to overcome that presumption. *See Halderman v. Pennhurst State School and Hospital,* 533 F.Supp. 661 (E.D.Pa.1982). However, such a presumption does not apply to the conclusions of law proposed by the Special Master. I may not abdicate my responsibility to make a legal determination as to the constitutional significance of the facts as found. *See Polin v. Dun & Bradstreet, Inc.,* 634 F.2d 1319, 1321 (10th Cir. 1980).

The Special Master's findings of fact show the following: The UCJ is an aging eight-story facility located in the urban center of Elizabeth, New Jersey. As a county jail, it houses pretrial detainees and persons sentenced within the county to terms of less than one year. *N.J.S.A.* 2C:43–10(c). Persons sentenced to terms of one year or more normally may be housed at the UCJ for up to 15 days before they are transferred to a state facility, but under the declared state

---

12. On January 20, 1982, Governor Kean, in one of his first acts in office, extended the emergency executive action for an additional four months. Executive Order No. 1.

13. See Appendix A *infra.*

14. Hon. Worrall F. Mountain is a retired justice of the New Jersey Supreme Court. He served on that bench from 1971 until his retirement in June of 1979. Justice Mountain recently participated as a member of Governor Byrne's Task Force on Prison Overcrowding. I wish to express my deep appreciation for his excellent service as Special Master in this matter.

of emergency, they are being housed at the UCJ until the Commissioner determines otherwise.

The daily population of the UCJ has averaged well over 300 inmates for the last several months. On February 8, 1982, the date the Special Master toured the facility, there were 350 inmates housed at the UCJ, of whom 92 were awaiting transfer to state prisons. On February 15, 1982, there were 359 inmates, of whom 81 were awaiting transfer. On February 24, 1982, the total population at the UCJ was 385, of whom 101 were awaiting transfer to state facilities. At the hearing on the objections to the Special Master's report, counsel for the County defendants stated that the UCJ population as of March 24, 1982, was 362 inmates of whom 97 were state sentenced inmates. As of the week of April 19, 1982, the population had risen to 392, of whom 115 were state sentenced inmates. *See* Affidavit of Gary Mitchell, filed April 22, 1982.

It can be calculated from the facts adduced by the Special Master with respect to the jail population on February 15, 1982, that pretrial detainees account for approximately 57% of the total population. The duration of confinement of the persons being housed at the UCJ on that particular date was in excess of 75 days for 36.5% of the population, more than 45 days but less than 75 days for 18.1% of the population, and less than 45 days for 45.4% of the population. Of those inmates who had been at the UCJ for more than 75 days as of February 15, 1982, 53.4% were pretrial detainees. A further breakdown of the category of persons who had already been confined for 45 days indicates that 57% were pretrial detainees.

The UCJ contains 218 general population cells arranged on 19 tiers. Each cell is equipped with a single bed and a combination toilet/sink fixture. All of the general population cells, with the exception of one each on A and B tiers, measure approximately 39 square feet. Of this, approximately 22 square feet are taken up by the furnishings. A corridor fronts the cells on each tier and increases the area accessible to inmates between 6:00 a. m. and 10:00 p. m. by an average of 23 to 28 square feet per inmate, assuming each cell houses only one person. Each cell corridor is equipped with one television set and one telephone. As there are no dining rooms at the UCJ, inmates take their meals on the tiers off trays brought by hot carts. Illumination for the cell areas comes from lights in the "officer's corridor" which runs parallel to the cell corridors and is separated from it by iron bars. All parties conceded to the Special Master that the lighting needs to be improved and the County is prepared to do so.

There are 10 detention/isolation cells ranging in size from 83 square feet to 113 square feet. These cells house inmates guilty of disciplinary infractions or those in need of medical isolation. Each contains a single bed and some are equipped with toilet fixtures.

In addition to the general population and detention cells, there is a "trustees/work release" dormitory currently housing approximately 26 inmates on single and double bunk beds and providing approximately 42.5 square feet per inmate. Two temporary dormitories have also been established in order to accommodate the increased population. Approximately 60% of the men's recreation area has been converted into bedspace for 26 to 28 inmates with an average area of confinement per inmate of 39 square feet. A second temporary dormitory has been constructed in the women's recreation area to provide housing for approximately eight more women with an average area of confinement of 47 square feet. Male dormitory inmates are confined to the dormitory area for substantially the entire day. For security reasons, the female dormitory inmates are confined to the women's tier cell corridor with all of the other women inmates during the daytime hours.

In spite of the creation of temporary dormitories, the County has had to resort to double-celling on the general population tiers in order to house all of the inmates in its custody. Since there is only a single bunk in a general population cell, double

celling has been accomplished by placing a mattress on the floor at night. Measuring approximately 16 square feet, the mattress must be placed adjacent to the toilet and occupies virtually all of the otherwise free floor space in the cell. The Special Master found that the double-celling practice has had its greatest impact on the pretrial segment of the population.

Double-celling reduces the night space per inmate from 39 square feet to 19.5 square feet, which includes the bed, the mattress and the toilet/sink fixture. As stated above, the *floor* space is nonexistent. The cell corridor space is also decreased in proportion to the number of cells on the tier that are housing two persons. If half the cells on a tier are being used to house two inmates, the average corridor space per inmate for daytime use is between 15 and 21 square feet, depending on the particular tier. If all the cells on a tier have double occupancy, the corridor space per inmate is only between 11 and 14 square feet. The cell corridor on the women's tier is even more crowded when total double-celling occurs because the women in the temporary dormitory are also confined there during the daytime hours.

When the population at the UCJ has surpassed 365, some inmates have been assigned to mattresses placed on the floor in the laundry area or law library area. These inmates continue to sleep in these areas until the population is reduced, or until they are released or transferred.

The detention/isolation cells have also been affected by the overcrowded conditions at the UCJ. Some of these cells are being used to house as many as four inmates, of whom three must sleep on mattresses laid out on the floor. Inmates in these cells are confined there for all but a few hours a week. Some of the detention cells are equipped with a toilet fixture and group showers are provided daily.

The Special Master further found that the severely overcrowded conditions at the UCJ have had an adverse impact on the support services and inmate programs provided. Recreational opportunity has been especially curtailed due to the increased population and the decreased space available for recreation. Recreation for male inmates is limited to no more than one hour periods, twice per week, which time is also used for access to the law library. The recreational equipment available to the men consists of a ping-pong table and a weight machine. Recreation for the female inmates has been totally eliminated since that room was converted into dormitory space. No outdoor exercise area is provided or feasible because of the UCJ's urban location. The Special Master stated in his findings with respect to this program: "Under existing conditions, I find that there is almost no realistic opportunity for male inmates to enjoy recreation while confined at the UCJ." Special Master's Report ("SMR"), at 13.

Visitation privileges have also been curtailed as a result of the severe overcrowding. Formerly, inmates could receive visitors three times a week for up to one-half hour. Currently, the visitation period must be limited to five or ten minutes and even with that adjustment, not all visitors can be accommodated.

In addition to the impact of the overcrowded conditions on recreation and visitation, the Special Master found that there has been some noncompliance with the State regulation requiring that inmates be provided clean clothes weekly and clean towels daily. Other programs, although they are being administered, have naturally been overburdened by the demands of an increased population. The lack of a screening medical examination during the admission process, while not a phenomenon related to the overcrowding, was found to pose a serious health risk to all inmates.

Instances of fighting amongst inmates have increased due to the overcrowded conditions at the UCJ. Tension has also increased. These present problems could develop into an extremely serious security problem if the UCJ continues at its current population levels into the hot summer months.

## OBJECTIONS

There have been no fundamental objections raised by the parties with respect to the Special Master's proposed findings of fact. The County has not filed any objections to the report. The Commissioner's objections with respect to the findings of fact refer only to the Special Master's recommended remedy for alleviating the conditions at the UCJ. Consideration of these objections will be deferred until I have discussed the proposed conclusions of law. The Public Defender has suggested that the proposed findings of fact as to adequacy of certain services are not erroneous if taken in tandem with the improvements already promised by the County, *e.g.*, an increase in the budget for additional medical and dental services. As the County has represented that these services will be improved, I do not find that consideration of this objection is necessary.

I have determined that none of the proposed findings of fact are clearly erroneous, and I shall therefore adopt them without modification.

## CONCLUSIONS OF THE SPECIAL MASTER

Based upon the facts as found, the Special Master concluded that the overcrowded conditions at the UCJ do amount to punishment of the pretrial detainees, *Bell v. Wolfish, supra,* and cruel and unusual punishment of sentenced inmates, *Rhodes v. Chapman, supra.* Specifically, he suggested that the total impact of the following conditions violate the due process rights of the pretrial detainees:

> [T]he unsuitable and unsanitary sleeping conditions resulting from inmates being forced to sleep on mattresses, the almost complete absence of recreational facilities, the cutbacks in visitation, the delays encountered in administering inmate programs, the inadequate lighting in the cellblocks, the inability to provide clean inmate clothing in accordance with *N.J.*

*A.C.* 10A:31–3.13(b)(5), and the absence of a medical screening procedure for new inmates, amount to "genuine privations and hardships" which cannot be justified by the mere fact that a statewide prison overcrowding problem exists.

SMR, at 19–20.

With respect to sentenced inmates, the Special Master applied the *Rhodes* standard and proposed that "the totality of the conditions currently existing in the UCJ is so severe, in at least two respects, that it exceeds contemporary standards of dignity, humanity and decency and therefore constitutes cruel and unusual punishment." SMR, at 24. Those two respects are the confinement of more than one inmate in each detention cell on floor mattresses for more than several days and the utilization of floor mattresses in the general population cells, library, and laundry areas, for extended periods of time.

The Special Master, pursuant to the Order of Reference dated January 29, 1982, also addressed the issue of the maximum jail capacity that could be constitutionally accommodated. He recommended a maximum capacity of 244 persons which represents single occupancy in each of the 218 general population cells plus the 26 bedspaces in the "trustee/work release" dormitory.[15] He determined that the temporary male and female dormitories must be reconverted to recreational space in order to reinstitute daily recreation. A proposal consisting of certain structural changes put forward by the third-party defendant was rejected primarily because its implementation would exacerbate the already insufficient recreation opportunity. Secondarily, the Special Master found that the "benefit" to be gained from these proposed temporary solutions was substantially outweighed by the costs.

Finally, the Special Master recommended as corrective measures that the County eliminate all uses of mattresses, reconvert the temporary dormitories to recreation

---

**15.** The Special Master found that 15 new intake cells would increase the maximum capacity to 259 when they become operational even though they were not designed as general population cells. SMR at 29–30.

space, develop a medical screening procedure, and take all steps necessary to provide clean clothing to inmates in accordance with *N.J.A.C.* 10A:31–3.13(b)(5). Furthermore, it was recommended in the report that both the County and the Commissioner be given a reasonable period of time in which to reduce the jail population to the 244 cap. The Commissioner should act by removing the state sentenced inmates; the County should act through the means stipulated to in the Consent Judgment of October 22, 1981.

## OBJECTIONS

Objections have been raised by the third-party defendant to the legal standards applied by the Special Master and the legal conclusions drawn therefrom. As stated above, Fed.R.Civ.P. 53(e)(4) requires the district court to review the proposed conclusions of law of the master and determine for itself whether violations exist. I have determined that the Special Master applied the correct legal principles to the conditions at the UCJ and drew the correct conclusion as to the constitutionality of those conditions.

## CONSTITUTIONALITY OF CONDITIONS AT THE UCJ

### A. *Pretrial Detainees*

 The population at the UCJ consists of both pretrial detainees and sentenced inmates, but pretrial detainees are in the majority. The Constitution requires different avenues of inquiry in evaluating the conditions under which these classes of persons may be confined. *Bell v. Wolfish, supra,* 441 U.S. at 535, 99 S.Ct. at 1871. The Court stated in *Wolfish* that pretrial detainees are protected by the Fourteenth Amendment against the deprivation of liberty without due process of law and they therefore have a right to be free from punishment prior to an adjudication of guilt. Thus, the test to be applied to the overcrowded conditions at the UCJ is whether they amount to the punishment of this group of inmates. *Wolfish, supra,* 441 U.S. at 535, 99 S.Ct. at 1871; *see Lareau v.*

*Manson,* 651 F.2d 96, 102 (2d Cir. 1981); *Lock v. Jenkins,* 641 F.2d 488, 491 (7th Cir. 1981); *Inmates of the Allegheny County Jail v. Pierce,* 612 F.2d 754, 758 (3d Cir. 1979).

A determination must be made as to whether the condition or restriction is "imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Wolfish, supra,* 441 U.S. at 538, 99 S.Ct. at 1873. The *Wolfish* Court further articulated this standard:

> Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable to it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Kennedy v. Mendoza-Martinez,* 372 U.S. [144] at 168–169 [83 S.Ct. 554 at 567, 568, 9 L.Ed.2d 644] . . .

441 U.S. at 538, 99 S.Ct. at 1873.

I concur with the Special Master's conclusions that there has been no express intent to punish the inmates at the UCJ on the part of either the defendants or the third-party defendant. The determination, then, of whether the conditions at the UCJ violate the constitutional rights of the pretrial detainees confined there must depend on analysis of the reasons for and the reasonableness of those conditions. The Court in *Wolfish* considered the operation of a detention facility in a manageable fashion to be a "valid objective that may . . . dispel any inference that [a] restriction [is] intended as punishment." 441 U.S. at 540–41 & n.23, 99 S.Ct. at 1874–75 & n.23.

The restriction or condition at issue in this litigation is the severe overcrowding of the facility and the impact of the excess population on the provision of services and programs, especially recreation and visitation. The Special Master found that "the conditions caused by severe overcrowding, including cutbacks in inmate privileges and services, are an unavoidable incident of the

jail officials' efforts to 'effectively manage' the facility during a statewide prison overcrowding emergency." SMR at 19. I would add that the interests of local and state governments in not releasing onto the streets either pretrial detainees who are not bail worthy or convicted inmates are legitimate ones that *may* justify the severely overcrowded condition at the UCJ. However, the due process rights of the pretrial detainees will have been violated by this condition if it is excessive in relation to the legitimate interest sought to justify it.

Judged by this standard, I have determined that the Special Master correctly found that the due process rights of the pretrial plaintiffs have been violated. This conclusion does not mean that there is a "one man, one cell" principle engrafted onto the Fourteenth Amendment. *Wolfish, supra,* 441 U.S. at 542, 99 S.Ct. at 1875. It is clear that the Supreme Court has not adopted a *per se* rule against double-celling. However, the Court has also not ruled that double-celling is *per se* constitutional.

> While confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record.

441 U.S. at 542, 99 S.Ct. at 1875.

In *Wolfish,* a federally-operated short-term custodial facility in New York City, the Metropolitan Correctional Center ("MCC"), was the subject of the class action complaint. The MCC was opened in 1975 and it represented " 'the architectural embodiment of the best and most progressive penological planning.' " 441 U.S. at 525, 99 S.Ct. at 1866 (quoting the Court of Appeals). The Court examined the totality of the circumstances in determining that the pretrial detainees at the MCC did not endure genuine hardships. "The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was

intended to include the most advanced and innovative features of modern design of detention facilities." 441 U.S. at 525, 99 S.Ct. at 1866.

The inmates at MCC are double-bunked in rooms measuring 75 square feet. The cells, while designed for single occupancy, have been furnished with double bunk beds in order to accommodate the excess population. While 37.5 square feet is an "admittedly rather small sleeping place", several factors brought it within tolerable limits: (a) inmates are confined to the room essentially only during sleeping hours; (b) during the daytime hours they have free access to large common areas and hence do not depend upon the limited amount of space in the cell for exercise; and, (c) nearly all of the detainees are released within 60 days. *Wolfish, supra,* 441 U.S. at 541–43 & n.26, 99 S.Ct. at 1875–76 & n.26.

As the Court in *Wolfish* stated, MCC differs markedly from traditional jails. The UCJ is a traditional jail. As outlined above, the cells at the UCJ have a floor space of 39 square feet inclusive of furniture and fixtures. Double-celling has been accomplished by placing a second mattress on the floor of the cell. While inmates are confined to these cells only during the night hours, during the daytime period they do not have open access to a large dayroom or common area. The cell corridors are narrow and necessarily overcrowded to the same extent that the cells are overcrowded. Recreation in the dayroom is available only in shifts and with the population at approximately 350, the staff has not been able to provide more than two hours of recreation per week.

The Special Master found that under these conditions the practice of double-celling was unconstitutional, particularly because of the use of floor mattresses but also because of the impact of overcrowding on recreational and visitation opportunities. The use of mattresses in the detention cells and in other areas of the UCJ was also considered to be unconstitutional by the Special Master. I shall first review his findings with respect to the use of mat-

tresses. I shall thereafter consider the impact of overcrowding on recreation and visitation.

■ I agree with the Special Master that the use of floor mattresses constitutes punishment without due process of law in contravention of the rights of pretrial detainees. *See Lareau v. Manson, supra; Vazquez v. Gray*, 523 F.Supp. 1359, 1365 (S.D.N.Y.1981). The practice is unsanitary, dehumanizing, and shocking.

■ In *Lareau*, 651 F.2d at 105, the Second Circuit held that the use of mattresses placed on the floor of a cell is "too egregious to warrant any ... leeway." The court considered the practice to be unconstitutional without regard to the number of days the practice continues. I do not agree that the caselaw supports a finding of *per se* unconstitutionality. Under the test articulated in *Wolfish, supra*, 441 U.S. at 542, 99 S.Ct. at 1875, the period of time during which an inmate is subjected to genuine privation and hardship is relevant to a due process inquiry. The clearer the hardship, the shorter the period of time before it raises serious questions under the Due Process Clause.

■ With respect to the use of floor mattresses in the general population cells, detention cells or other areas of the UCJ, I find that such means are permissible only during an emergency and only if no detainee is so confined for a period longer than 48 to 72 hours. It would be preferable if collapsible cots were available at least for use in the library or laundry areas. If the defendants are confronted with an "emergency" of longer duration, they are instructed to comply with the other provisions of my order detailed below. (See Appendix B).

■ In a footnote, the Special Master restricted his consideration of the constitutionality of confining two detainees to a cell to the condition of using mattresses to accomplish "double-celling" and declined to reach the issue of "double-bunking." [16] The Commissioner, in his objections to the report of the Special Master, argued vigorously that double-bunking would remedy the unconstitutional conditions at the UCJ without the need to reduce the population immediately through the transfer of state sentenced prisoners. I specially ordered the parties to address the feasibility and constitutionality of double-bunking at the hearing on March 25, 1982.

The County complied with my request for supplemental briefing by stating that the bunks presently being used in the temporary dormitory cannot be utilized in the general population cells because of the height of the cells. I concur with the third-party defendant that this information is an inadequate response to my directions. The feasibility of other and different forms of bunk beds has not been addressed by the party most familiar with the structural properties of the UCJ. However, for purposes of my analysis under the Fourteenth Amendment, I shall assume that some form of double-bunking is possible.

There can be no doubt that using a double bunk bed is an obviously more sensible manner of providing a person with a place to sleep. However, the issue is still whether this solution passes muster constitutionally under all the conditions at the UCJ. In this Court's judgment it does not. In a detention facility with larger cells, the arguments of the third-party defendant would be quite plausible. Here, the cell space is, at most, paltry. While the use of a frame bed does mean that an inmate is not required to sleep on the floor next to the urinal, subject to sewage back-up, etc., it does not alter the spatial dimensions of the living quarters. Furthermore, this Court must maintain its focus on the issue of whether the UCJ meets minimum standards of decency.

---

16. None of the parties has testified, or otherwise suggested, that it would be feasible to equip the 39 square foot general population cells at the UCJ with two beds. I make no ruling on the feasibility or constitutionality of such a practice since that question was not raised in the record before me.
SMR at 28 n.19.

The stark reality is that, whether provided with bare mattresses or mattresses placed on a frame, when the 39 square feet general population cells are shared by two persons, each person has 19.5 square feet of space inclusive of furniture and fixtures for the period of lock-up at night. Double-bunking in the UCJ is therefore roughly equivalent to quadruple-bunking in the MCC at issue in *Wolfish.* Such spatial starvation cannot pass muster constitutionally. Even the incarcerated are entitled to something more than a walk-in closet.

Furthermore, there is no relief during the day from the adverse effects of overcrowding. As the Special Master found:

> The cell corridors and dormitories where the inmates spend the overwhelming majority of their waking hours are cramped, overcrowded and would allow little opportunity for free movement or exercise even at normal population levels. The pretrial detainees currently housed in general population cells or dormitories at the UCJ can do little more than watch television from 6:00 a. m. in the morning to 10:00 p. m. at night.

SMR, at 22. If I assume that only half of the cells on any one tier are to be double-bunked under the Commissioner's proposed remedy,[17] the average corridor space per person for daytime use will be between 15 and 21 square feet. Added to one person's share of the space of a double-bunked cell, a pretrial detainee at the UCJ is restricted nearly twenty-four hours a day to an area which the Court in *Wolfish* ruled was barely sufficient for sleeping purposes. It falls far short of the 105 square feet governing new prison construction in this state. *N.J. A.C.* 10A:31–2.8(a)(4), (12).

Other courts have found jails with similar or more generous spatial dimensions than those in the UCJ unconstitutional. *See Lareau, supra; Campbell v. Cauthron,* 623 F.2d 503 (8th Cir. 1980); *Heitman v. Gabriel,* 524 F.Supp. 622 (W.D.Mo.1981); *Vazquez, supra; Hutchings v. Corum,* 501 F.Supp. 1276 (W.D.Mo.1980); *Benjamin v. Malcolm,* 495 F.Supp. 1357 (S.D.N.Y.1980). Thus based solely on considerations of space, I find that double-celling or double-bunking at the UCJ subjects pretrial detainees to genuine hardships amounting to punishment in violation of the Fourteenth Amendment.

My decision does not rest upon an incorporation into the Due Process Clause of the various correction associations' recommendations with respect to the number of square feet appropriate for daytime space in a jail such as that contained in *N.J.A.C.* 10A:31–2.8(a). *See Wolfish, supra.,* 441 U.S. at 543–44 n.27, 99 S.Ct. at 1876–77 n.27. However, the 30 to 40 square feet allotted to a double-bunked detainee is grossly inadequate in comparison to any of these professional standards.[18]

Furthermore, overcrowded cells cannot be examined for constitutionality in isolation from the overall circumstances in the facility. *Wolfish, supra,* 441 U.S. at 525, 99 S.Ct. at 1866. In MCC, the hardships, if any, which are imposed upon pretrial detainees by double-bunking are mitigated by the unlimited daytime access to the large common areas. In UCJ, the more serious privations are aggravated by the overcrowded corridors, and the lack of meaningful recreation and other necessities. (For the female inmates, there is a lack of any recreation.) What the Second Circuit stated in *Lareau* with respect to the detention facility in

---

17. This premise is reasonable when based on a population at the UCJ of at least 359 because, assuming I order the elimination of the temporary dormitories and I restrict the detention cells to no more than double occupancy as recommended by the Special Master, 115 out of the 218 general population cells would have to be double-celled. On the day the Special Master toured the UCJ, three tiers were totally double-celled, restricting these inmates to less than 15 square feet of corridor space.

18. For a summary of the recommendations of various commissions, courts and professional organizations, see 3 National Institute of Justice, American Prisons and Jails 2–7 (1980). The recommendations range from 50 to 80 square feet per inmate. Approximately 88% of local jails, according to the National Jail Census, have at least 40 square feet of floor space. 1 National Institute of Justice, American Prisons and Jails 83 (1980).

Hartford, Connecticut, is applicable here: "[T]here is no real respite for the double-bunked inmate from the pressures of overcrowding." 651 F.2d at 101.

As found by the Special Master, the County has been unable to provide the inmates with daily recreation off the tier. This is attributable to two factors. The recreation room has been reduced from 1,758 square feet to 720 square feet in order to erect a temporary dormitory for the men during the overcrowding emergency. In addition, the sheer size of the population has overburdened the staff and necessitated a shortening of the recreation time available to each inmate. Yet, recreation, as testified to by Gary Hilton, Assistant Commissioner of Corrections, before the Special Master, is one of the most important programs in a county jail setting for alleviating physical and mental stress.[19] Even if all of the tiers were single-celled, Mr. Hilton recommended that a commitment should be made by the County to improve the off-tier recreation facilities.

The Commissioner proposes that elimination of the temporary dormitories for the men and women in conjunction with the establishment of a double-bunking practice would remedy any unconstitutional condition at the UCJ. I find this proposal to be unsatisfactory. It is doubtful that recreation will improve so long as the population is as high as it has been for several months even if the size of the recreation room is returned to its normal dimensions. The third-party defendant, in effect, is proposing a trade-off of one "genuine privation" for another. Either the pretrial detainees

suffer increased crowding in the cells in order to enjoy slightly improved recreation opportunity or they suffer with the present recreation situation in order to enjoy slightly less crowded cells.[20]

Nor is access to a crowded corridor an adequate substitution for real exercise and recreation. The Special Master found the corridors sufficient only for passive activities, such as watching television. At the hearing, the Attorney General on behalf of the third-party defendant suggested, "The best recreation is walking. You can read that in every newspaper article about health and fitness." Transcript at 17. Yet, the Eighth Circuit in *Campbell v. Cauthron*, 623 F.2d 503, 507 (1980), in considering the constitutionality of the Sebastion County Jail, stated: "Merely allowing the inmates to walk around in the narrow corridor between cells does not provide adequate exercise." I agree, and it is evident that Assistant Commissioner Hilton does as well. While I appreciate the salutory effect of walking as an exercise, walking in the cramped corridors of the UCJ cannot satisfy the requirement of providing an inmate with a "healthy habilitative environment." *Battle v. Anderson*, 564 F.2d 388, 395 (10th Cir. 1977). By any reasonable standard, the provision for recreation and exercise at the UCJ at the present population level is woefully inadequate.

The overcrowded condition of the UCJ is the cause not only of inadequate recreation but also, as found by the Special Master, of reduced visitation privileges. This, too, aggravates the tensions already present because of double-bunking. As testified to by

---

**19.** Transcript of Proceedings, Feb. 18, 1982, at 61 62:

> Mr. Hilton: In a county jail if you were to rate some things that I see as significant the terms of, you know, setting aside food and medical and those things—I think access to a telephone is an extremely significant factor in terms of maintaining mental health.
> The fact that, you know, you don't have—are not able to call. That is a tremendous psychological thing. Visits, recreation and an act of the Public Defender Program, where lawyers are in the place, they are seen and they answer telephone calls and don't

> put inmates off with, "I am in Court," or something like that.
> I think they are the four things that make a county jail tolerable.

**20.** The impact of double-celling has been greatest on the pretrial detainees. Of the 162 inmates subject to double-celling on February 24, 1982, 142 were pretrial detainees. SMR at 8 n.6. This degree of double-celling occurred even though there has been established at the UCJ two temporary dormitories in the former recreation spaces. Recreation and housing in the UCJ are flip sides of the same coin.

Assistant Commissioner Hilton, visitation has a very significant impact on the mental well-being of an incarcerated person.[21] Under the present circumstances, visits have been limited to five to ten minutes, if not indirectly discouraged altogether.[22]

I have determined that double-bunking at the UCJ violates the due process rights of pretrial detainees. It constitutes "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardships over an extended period of time." *Wolfish, supra*, 441 U.S. at 542, 99 S.Ct. at 1875.

B. *Sentenced Inmates*

 In addition to pretrial detainees, there are confined at the UCJ inmates already sentenced to county or state terms of imprisonment. Because these persons have been convicted, the Constitution does not protect them from all punishment but only from cruel and unusual punishment. *Rhodes v. Chapman, supra.* The Special Master found that the practice of sleeping sentenced inmates on mattresses in the general population cells, in the detention/isolation cells, and on the library or laundry floors violated the Eighth Amendment rights of those persons. He also found that sentenced inmates were deprived of adequate recreational opportunity to the same extent as pretrial detainees. *See Miller v. Carson*, 563 F.2d 741, 750 (5th Cir. 1977).

In *Rhodes, supra*, the Court set forth the yardstick to be applied in measuring a prison condition under the Eighth Amendment:

Today the Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," . . . or are grossly disproportionate to the severity of the crime . . . . No static "test" can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

452 U.S. at 346, 101 S.Ct. at 2398. (citations omitted).

At issue in *Rhodes* was the Southern Ohio Correctional Facility ("SOCF"), a modern maximum-security state prison. The Court reviewed the findings of the district court and concluded that they did not substantiate its ultimate finding of unconstitutionality. The cells at SOCF are 63 square feet and contain a bunk bed, night stand, sink with hot and cold running water, a sanitary toilet, and a wall-mounted shelf, cabinet and radio. They are heated and ventilated, and some even have a window that inmates can open and close. 452 U.S. at 341, 101 S.Ct. at 2396. In sum, as the Court stated, "though small, the cells at SOCF are exceptionally modern and functional." *Id.* at 349 n. 13, 101 S.Ct. at 2400 n. 13.

As a result of double-celling at SOCF, job and educational opportunities had diminished "marginally". *Rhodes, supra*, 452 U.S. at 348, 101 S.Ct. at 2399. However, it "had not reduced significantly the availability of space in the day rooms or visitation facili-

---

**21.** Transcript of Proceedings, February 18, 1982, at 57, 60:

Mr. Hilton: Visiting is, you know very significant—a very significant aspect.

\* \* \* \* \* \*

Mr. Mitchell: There are contact visits in the State system?
Mr. Hilton: Yes, they have them. For most of our inmates, yes.

\* \* \* \* \* \*

Mr. Mitchell: . . . What is your opinion of a visitation policy that provides a five minute visit, an opportunity for a five minute visit through a barrier?

Mr. Hilton: Five minutes is a brief period for a visit. If somebody has to come any distance, I think one thing, it is a lot of wasted time. It is as important as visitations—as important is [sic] the inmate's use of a telephone on demand, almost. I think that reduces a lot of anxiety and a lot of the, you know, sense of being away and lost.

**22.** For some friends and relatives, the prospect of a five-minute visit cannot justify the travel and waiting time. *See, e.g.*, Affidavits of Inmates Terrell and Thomas, SMR Appendix at A91–96.

ties." *Id.* at 342, 101 S.Ct. at 2396. In light of these findings, Justice Powell, writing for the Court concluded:

> The double celling made necessary by the unanticipated increase in prison population did not lead to deprivations of essential food, medical care, or sanitation. Nor did it increase violence among inmates or create other conditions intolerable for prison confinement.

*Id.* at 348, 101 S.Ct. at 2399.

 Conditions at the SOCF obviously do not mirror conditions in older prisons which the Court stated "have justly been described as 'deplorable' and 'sordid.' *Bell v. Wolfish,* 441 U.S. at 562, 99 S.Ct. at 1886." *Rhodes, supra,* 452 U.S. at 352, 101 S.Ct. at 2401. When such conditions "alone or in combination ... deprive inmates of the minimal civilized measure of life's necessities," *id.* at 347, 101 S.Ct. at 2399, and can be said to be cruel and unusual under contemporary standards of decency, federal courts must "discharge their duty to protect constitutional rights.' " *Id.* at 352, 101 S.Ct. at 2401.

 The conditions of overcrowding and double-celling are not to be viewed in isolation. Rather, provision of space must be viewed against the totality of conditions. *Rhodes, supra,* 452 U.S. at 363 & n.10, 101 S.Ct. at 2407 & n.10 (Brennan, J., concurring). *See also, Stewart v. Winter,* 669 F.2d 328, 335–36 (5th Cir. 1982); *Ruiz v. Estelle,* 666 F.2d 854, 858 (5th Cir. 1982); *Madyun v. Thompson,* 657 F.2d 868, 874 (7th Cir. 1981); *Hendrix v. Faulkner,* 525 F.Supp. 435, 524 (N.D.Ind.1981).

 I agree with the Special Master that requiring sentenced inmates to sleep for long periods of time on mattresses positioned on the floor constitutes cruel and unusual punishment. It is a "reprehensible and dehumanizing" practice. SMR, at 25. The practice deprives these inmates of the essential requirement of habitable shelter. As stated by the Tenth Circuit, shelter is a core area of concern under the Eighth Amendment and it goes beyond having a solid roof over one's head:

> In *Battle v. Anderson, supra,* we upheld the district court's conclusion that "[i]t is incumbent on the incarcerating body to provide the individual with a healthy habilitative environment." 564 F.2d at 395. In affirming in *Battle,* we upheld the finding that 60 square feet of living space was the minimum amount of square footage which the Eighth and Fourteenth Amendments require that a state provide an inmate. *Id.* at 395, 397, 403.... In short, a state must provide an inmate with shelter which does not cause his degeneration or threaten his mental and physical well-being. *Battle v. Anderson, supra,* 564 F.2d at 403.

*Ramos v. Lamm,* 639 F.2d 559, 568 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

 Even considering the incremental improvement in living conditions at the UCJ that would occur upon substituting bunk beds for mattresses, the stark reality is that 30 square feet of daytime space or 19.5 square feet of sleeping space fails to meet any contemporary standard of decency especially in light of the impact overcrowding has had on visitation, recreation, and time off the tier, as detailed above. *See, e.g., Lareau, supra; Ramos, supra; Ruiz, supra; Smith v. Fairman,* 528 F.Supp. 186 (C.D.Ill.1981). With regard to the detention/isolation cells, I agree with the Special Master that the cells can constitutionally accommodate two persons if each is provided with a bed. But the practice of housing three or four inmates on mattresses is deplorable and cannot be countenanced.

 Although the standard against which the court must judge conditions imposed upon sentenced offenders is more stringent than that which guides the analysis of conditions of confinement of pretrial detainees, I find that the conditions at the UCJ are too egregious to satisfy either standard. Double-bunking, as practiced at

the UCJ or as proposed, except in the detention/isolation cells, violates the Eighth Amendment as well as the Fourteenth Amendment.

In sum, I will accept the proposed conclusions of law of the Special Master, as modified by my consideration of the constitutionality of a double-bunking practice at the UCJ. I must now turn my attention to fashioning an appropriate remedy for these constitutional violations.

## REMEDY

■ I am very mindful of the delicate balance established by the Constitution between federal and state governments. *See Rizzo v. Goode*, 423 U.S. 362, 378, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976); *see also* O'Connor, *Trends in the Relationship Between the Federal and State Courts from the Perspective of a State Court Judge*, 22 Wm & Mary L.Rev. 801 (1981). Especially in the area of prison administration, judicial restraint is necessary in order to ensure that the business of operating a state corrections system stays in the hands of persons most able to accomplish this difficult task. *Bell v. Wolfish, supra*, 441 U.S. at 562, 99 S.Ct. at 1886.

■ These admonitions give a federal court pause to consider the implications of interfering in a local jail problem. Nevertheless it is a solemn duty of a district court to "scrupulously" observe whether there has been a constitutional failing in a challenged jail facility. *Wolfish, supra; Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In *Procunier, supra*, 416 U.S. at 405–06, 94 S.Ct. at 1807–08, the Court said:

> But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

As I have determined that the UCJ as it is presently operated offends the fundamental guarantees of the Eighth and Fourteenth Amendments, I must complete the task required of me by the Constitution.

■ It has been noted previously that all the parties agree that the UCJ is seriously overcrowded and that the single most pervasive cause for this condition is the continued presence of state sentenced inmates. The confinement of state inmates in the UCJ is caused, in turn, by the valid and reasonable exercise of powers vested in the Commissioner under the Governor's Executive Orders. *Worthington v. Fauver, supra*, 88 N.J. at 198, 440 A.2d 1128. Consequently, the overburdened Union County facility, as detailed above, has succumbed to other egregious conditions, such as the lack of meaningful recreation and visitation, and the lack of adequate living space, which undermine its habitability.

I have concluded on this basis that the environment at the UCJ is so degenerative and unhealthy as to be constitutionally impermissible. As the Executive Orders have contributed substantially to this unconstitutional situation, under the Supremacy Clause of the Constitution the Executive Orders as applied to the UCJ must yield. U.S.Const.Art. VI, cl. 2. *See also Jacobson v. Massachusetts*, 197 U.S. 11, 25, 25 S.Ct. 358, 360, 49 L.Ed. 643 (1905). The administrative action designating the UCJ as the place of confinement of state sentenced inmates is void and *N.J.S.A.* 2C:43–10(e) shall be given full force and effect.

This Court, however, is not unmindful of the good faith efforts of this administration and the previous administration to find a solution to the problem of overcrowding. *See, e.g., Report of the Governor's Task Force on Prison Overcrowding*, December 3, 1981. Governor Kean has taken special note of this crisis. He indicated in his budget message, delivered on March 15, 1982, the State's role and its responsibility in the matter of insufficient county jail bedspaces:

Our state problems have been passed down to the counties and in some cases even to our municipal jails. Go, as I have, to jails in counties like Essex, Passaic and Camden and you will see the results of our neglect. This budget provides us with the money to start to rectify this problem and place state prisoners into state custody where they rightfully belong.

It is obvious that the Chief Executive of the State is aware of the problem.

One of the measures which the Governor is taking in response to this emergency, in addition to seeking appropriations for new prison construction, is the execution of a lease with the United States Army for the use of the stockade at Fort Dix. At my request, Commissioner Fauver submitted an affidavit outlining the timetable for the transfer of inmates to Fort Dix, to be designated as the Mid-State Correctional Facility:

> I anticipate that I would be able to arrange for the placement of state inmates in the Mid-State Correctional Facility, commencing May 15 to May 31, at the rate of 80 per week, until the facility is filled with 500 inmates on or about approximately July 10.

Affidavit of William H. Fauver, filed April 5, 1982, ¶ 11. Hopefully this facility will go some of the distance toward rectifying the State's "neglect".

I am persuaded by the good faith representations of the third-party defendant that at least a temporary solution to the UCJ situation can feasibly be arranged by approximately June 15, 1982. Insofar as the State is acting with reasonable alacrity in this matter, I will stay the operation of *N.J.S.A.* 2C:43–10(e) as applied to the UCJ until July 1, 1982, rather than impose an overnight remedial order upon the parties. The stay will provide the State with sufficient leeway to enable it to administer the transfer of state sentenced inmates from the UCJ. Whether the measures proposed by the administration will suffice beyond the immediate moment and solve the long-run crisis of a burgeoning prison population should give the public pause, but it is not an issue properly before this Court. Nor does this Court have jurisdiction to order alternative relief in the form of, *e.g.*, parole guideline revisions. That clearly is the duty of the state legislature. My duty is to order speedy but fair relief for the plaintiffs to remedy the constitutionally impermissible conditions under which they are confined before the hot summer months ignite this tinderbox.

■ I have also determined that the County, which is primarily responsible for providing a constitutional jail, is not to be relieved of the consent judgment it voluntarily entered into except in one respect. Fed.R.Civ.P. 60(b)(6). That rule provides in pertinent part:

> On motion and upon such terms as are just, the Court may relieve a party or his legal representatives from a final judgment, order or proceeding for ... (6) any reasons justifying relief from the operation of the judgment.

On the motion to set aside the consent order, the County has the burden of proving that the order is too burdensome under circumstances that have significantly changed since the settlement was entered into. *See United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). Although *Swift* was decided prior to the enactment of the federal rules, it continues as the standard for equitable relief from a judgment. In *Swift*, the Court stated:

> There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static,

.... The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

286 U.S. at 119, 52 S.Ct. at 464.

The order being entered as a result of this decision relieves the County of a substantial burden. It in effect grants to the County the injunction on the third-party complaint sought by it prior to my appointment of the Special Master. Furthermore, circumstances have not changed significantly since the County entered into the stipulation of settlement. As stated by Judge Lasker in the Southern District of New York in a similar State prison-County jail context: "Moreover, the only circumstance which has changed—an increase in the population of the State's prison population— was entirely foreseeable in [October], 1981, and had been for a long period before that date." *Benjamin v. Malcolm*, 528 F.Supp. 925, 929 (1981).

■ Because I believe that the provision in the consent order requiring the County to close the doors to the UCJ as a "last-resort" measure is an unnecessarily intrusive and disruptive one, I will relieve the County of complying with it. In its stead, the County is directed to exhaust in good faith all other avenues of relief set forth in that order and then to seek relief in this Court.

As the County has not filed any objections to the report of the Special Master and as I have concurred in all material respects with the findings and conclusions of that report, the County shall be ordered to implement a medical screening program, to reinstate the recreation and visitation programs to prior levels, and to comply with *N.J.A.C.* 10A:31–3.13(b)(5) regarding clean clothes and towels. I note the representations made by the County to the Special Master that lighting on the tiers will be improved and that additional medical and dental personnel will be hired.

■ One final remedial measure must be established: a maximum population capacity. While the Second Circuit has preferred a more flexible mechanism, *see Lareau, supra*, the circumstances of the UCJ make it more appropriate to use a "cap". In this case, all the parties have either consented to or admitted that the capacity of the UCJ is 238. *See* Letter from William H. Fauver to Judge DiBuono, dated February 20, 1981, SMR Appendix at 224. I find that the facts support a capacity figure of 259: 218 single general population cells, 26 in the "trustee/work release" dormitory, and 15 new intake cells. The detention/isolation cells with a double bunk in each are not included in the capacity because they are reserved for special administrative purposes. In light of my order directing the Commissioner to remove the state sentenced inmates by July 1, 1982, I find that the County should have until July 1, 1982, to implement the "cap" as a reasonable accommodation of all interests.

I will retain jurisdiction in order to monitor compliance with the order being entered on this decision. The Special Master is to report to the Court every sixty days until discharged. Defendant Colletti is to report on the County's actions pursuant to this order every sixty days until ordered otherwise. The report is to be served upon the parties, the Special Master, the Court, the County Prosecutor, the Board of Chosen Freeholders, and the assignment and criminal assignment judges of the County.

An order in conformance with this opinion has been filed by the Court.

APPENDIX A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 81–863

UNION COUNTY JAIL INMATES, :
TIMMIE LEE BARLOW, et al.,

 :

 Plaintiffs

 :

 vs.

 :

JAMES SCANLON, THOMAS
JEFFERSON, etc., et al., :

 Defendants : ORDER

 vs. :

WILLIAM H. FAUVER, Com- :
missioner, Department of
Corrections :

 Third-Party Defendant :

---

Pursuant to Rule 53(b) of the Federal Rules of Civil Procedure,

It is on this 29th day of January, 1982 ORDERED that this case is hereby referred to the HON. WORRALL F. MOUNTAIN as Special Master; and

It is further ORDERED that the Special Master shall conduct a thorough examination into the totality of the conditions at the Union County Jail in accordance with the guidelines set forth below and in this Court's Opinion of January 29th, 1982 and shall submit to the Court his proposed findings of fact and conclusions of law as to whether the overcrowded condition of the jail is violative of the Eighth Amendment to the United States Constitution with respect to sentenced inmates or of the Fourteenth Amendment with respect to pretrial detainees; and

It is further ORDERED that the Special Master shall have the additional duty to evaluate compliance with and make recommendations on the implementation of the Stipulation of Settlement and Consent Order entered by this Court on October 22, 1981; and

It is further ORDERED that, in order to enable the Special Master to carry out his duties, he shall have the following powers and authority:

1) The Special Master is authorized to select and hire, with prior approval of the Court, such assistant(s) as may be required to aid him in performing his duties. With prior approval of this Court, the Special Master may also consult appropriate, independent specialists.

2) The Special Master shall have unlimited access to the premises of the Union County Jail at any time and he shall notify counsel for the parties so that they or their designees may accompany him if they desire.

3) The Special Master shall have unlimited access at reasonable times to all files, statistics, plans, and reports relating to the Union County Jail.

4) The Special Master shall be authorized to conduct confidential interviews at any reasonable time with any staff member or inmate, and shall have the right to attend any institutional meeting or proceeding.

5) The Special Master shall be empowered to hold hearings and to call witnesses,

including both inmates and staff of the Union County Jail.

6) The Special Master shall have the authority to seek orders from the Court to show cause why the defendants or third-party defendant, or any of their agents, employees, or persons acting in concert with them, should not be held in contempt for failure to comply with his instructions or orders, or the Orders of this Court.

It is further ORDERED that the defendants shall post notices throughout the Union County Jail stating that the Court has appointed a Special Master, who may from time to time visit the jail, and talk to the staff members or inmates. The notice shall emphasize that the Special Master's function is only to aid the Court in its determination of the constitutionality of the overcrowded condition of the jail and of the defendants' compliance with the Court's Order of October 22, 1981; that his appointment is not to be considered as providing any substitute for, or addition to the regular grievance and disciplinary procedures of the jail; that he is not to investigate, to arbitrate, or to interfere with the disposition of the grievances or complaints of individual inmates or staff members; that if the Special Master desires any information from either inmates or staff with respect to such matters, he will initiate the matter; and that if any person, inmate or staff member desires to bring any matter to the attention of the Special Master, he or she may do so only by making the desire known to counsel for the parties, who will then decide whether to bring the matter to the attention of the Special Master. The notices to be posted throughout the Union County Jail shall state the name and address of counsel for the plaintiff class, counsel for the defendants, and counsel for the third-party defendant. The notices shall remain posted until the Special Master has been discharged. The form of the notices shall be drafted by counsel and fixed by the Special Master; and it is further

ORDERED that not later than forty-five (45) days after his appointment, the Special Master shall file his proposed findings of fact and conclusions of law as to whether the Union County Jail is unconstitutionally overcrowded. The report shall separately address the following specific issues:

1) what is the maximum capacity of the jail, taking into consideration day and night uses, and weekend sentences?

2) whether the support services and facilities can sufficiently accommodate that capacity; and

With respect to each issue, the Special Master shall, if appropriate, set forth a proposed timetable for the institution of any changes which he recommends, and a proposed classification scheme for any releases which may be necessary; and

It is further ORDERED that not later than forty-five (45) days after his appointment, the Special Master shall file his first report evaluating the defendants' compliance with this Court's Order of October 22, 1981. As to each item of the Stipulation of Settlement and Consent Order, the report should show:

1) the state of compliance;

2) the reasons for the defendants' failure or inability to comply with any item;

3) whether or not he believes that the defendants have made a good faith effort to comply;

4) the evidentiary basis for the Special Master's conclusions, whether observation, interview, statistical survey, hearing or other means;

5) recommendations as to how compliance could be effected, whether by specifically recommending the release of a number of persons or by modifying the responsibilities of the county under the Consent Order; and

It is further ORDERED that the parties shall have ten (10) days after the Special Master submits his report to serve written objections with the Court and other parties if they so desire; and

It is further ORDERED that within fifteen (15) days after the filing of the report, the Clerk of the Court shall set the case for a continuation of the order to show cause

hearing. The Court shall accept the Master's findings of fact unless clearly erroneous. The Court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions; and

It is further ORDERED that after the filing of the initial report on defendants' compliance with the Court's Order, the Special Master shall file reports not less often than every sixty (60) days, until he finds that the defendants and third-party defendant have fully complied with the Court's Order of October 22, 1981, or any Supplemental Orders of the Court, and that such compliance has continued for a sufficient length of time to make a lapse into noncompliance improbable. At that time, the Special Master may recommend his discharge; and

It is further ORDERED that pursuant to Rule 53, Federal Rules of Civil Procedure, the Special Master shall be allowed his necessary expenses and a fee of $85.00 per hour for his services in carrying out his duties, which shall be taxed as part of the costs of this matter and assessed against the defendants. The Special Master shall keep a record of the time spent in connection with his duties, which he shall submit to the defendants every thirty (30) days for processing and payment; and

It is further ORDERED that the Court shall retain jurisdiction over the parties and this cause of action.

APPENDIX B

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL NO. 81–863

| | | |
|---|---|---|
| UNION COUNTY JAIL INMATES, TIMMIE LEE BARLOW, et al., | : | |
| Plaintiffs | : | |
| v. | : | |
| JAMES SCANLON, THOMAS JEFFERSON, etc., et al., | : | ORDER |
| Defendants | : | |
| v. | : | |
| WILLIAM H. FAUVER, Commissioner, Department of Corrections, | : | |
| Third-Party Defendant | : | |

This matter having come before the Court on the motion of the third-party defendant, William H. Fauver, Commissioner, Department of Corrections, for a hearing on objections to the Special Master's Report filed February 26, 1982, pursuant to Fed.R. Civ.P. 53, and said hearing having been held on March 25, 1982; and

The Court having considered the Report of the Special Master, the objections of the parties, supplemental briefs and affidavits, and for the reasons expressed in its opinion of April 27, 1982,

It is on this 27th day of April, 1982, ORDERED that the findings of fact of the Special Master be adopted and that the Union County Jail be declared unconstitutionally overcrowded; and

It is further ORDERED that:

(1) On or before July 1, 1982, the third-party defendant is to remove any and all inmates incarcerated at the Union County Jail who as of fifteen (15) days prior to that date have been sentenced to terms of imprisonment in state facilities; and

(2) The third-party defendant from that date forward shall fully comply with N.J.S.A. 2C:43–10(e) with respect to persons who are or shall be incarcerated at the Union County Jail; and

It is further ORDERED that the Consent Judgment approved by this Court on October 22, 1981, continue in full force and effect, except as modified or supplemented as follows:

(a) The defendants shall, pursuant to N.J.A.C. 10A:31–3.16(b)(10), provide at least one hour of recreation daily to each inmate;

(b) The defendants shall reinstitute a program of at least three one-quarter hour visitation periods per week;

(c) The defendants shall implement a medical screening program for new admittees;

(d) The defendants shall provide clean clothing weekly and clean towels daily to all inmates in accordance with N.J.A.C. 10A:31–3.13(b)(5).

(e) The defendants shall not place more than two (2) inmates in any of the detention/isolation cells.

(f) The maximum capacity of the Union County Jail is, until it is enlarged, replaced or modified, two hundred fifty-nine (259), specifically to include one (1) person in each general population cell, twenty-six (26) persons in the "trustee/work release" dormitory, and one (1) person in each intake cell;

(g) The defendants shall have until July 1, 1982, to reduce the population at the Union County Jail to the maximum capacity;

(h) In addition to the other mechanisms required to be used under the Consent Judgment whenever the population has exceeded the maximum capacity for more than seventy-two (72) hours, the defendants shall after July 1, 1982, notify the Department of Corrections to remove any state prisoners who have remained at the facility beyond the statutory fifteen (15) day period since sentence was imposed, and shall notify the Board of Chosen Freeholders of the necessity to make other arrangements for the housing of the excess number of county inmates and pretrial detainees;

(i) The defendants shall further notify the parties to this action and this Court if either the Department of Corrections or the Board of Chosen Freeholders fails to act upon these notifications within two weeks, whereupon the Court shall take such actions as are consistent with and which will effectuate the Court's findings of fact and conclusions of law in its opinion filed this date; and

(j) The defendants shall not refuse to admit any persons lawfully brought to them, and any agreement to do such in the Consent Judgment entered on October 22, 1981, shall be null and void.

It is further ORDERED that no person who is or shall be incarcerated at the Union County Jail be required to sleep on a mattress placed on the floor of any cell or in any other area of the facility for longer than seventy-two (72) hours, after which time he or she shall be assigned to a single cell for at least two weeks, unless released or transferred sooner.

It is further ORDERED that defendant Coletti complete a report every sixty (60) days setting forth the weekly population figures for the preceding sixty day period, and the extent and means of compliance with this Court's order, and shall serve such report upon this Court, the Special Master, plaintiffs' counsel, County counsel, the Commissioner of Corrections, the Board of Chosen Freeholders, the County Prosecutor, the Assignment Judge of Union County, and the Criminal Assignment Judge of Union County.

It is further ORDERED that the Special Master shall monitor compliance by the defendants and the third-party defendant with the orders of this Court.

Jurisdiction is retained.