INMATES OF the ALLEGHENY COUNTY JAIL, Thomas Price Bey, Arthur Goslee, Robert Maloney, and Calvin Milligan on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Cyril H. WECHT, President of the Allegheny County Board of Prison Inspectors and the other members of the Board: Thomas Foerster and William H. Hunt, Commissioners for Allegheny County; Frank J. Lucchino, Controller for Allegheny County, Eugene Coon, Sheriff for Allegheny County; The Honorable Patrick R. Tamilia, Michael J. O'Malley and Marion K. Finkelhor, Judges Court of Common Pleas of Allegheny County; Richard S. Caliguiri, Mayor of the City of Pittsburgh; Harriet McCray; Monsg. Charles Owen Rice and Charles Kozakiewicz, Warden of the Allegheny County Jail, and William B. Robinson, Executive Director of Prison Inspectors, and Cyril Wecht, Thomas Foerster and William H. Hunt, as Commissioners of Allegheny County, Defendants.

Civ. A. No. 76–743.

United States District Court,
W.D. Pennsylvania.

May 25, 1983.

Timothy P. O'Brien, Edward J. Feinstein, Neighborhood Legal Services, Pittsburgh, Pa., Jere Krakoff, Jackson, Miss., for plaintiffs.

James H. McLean, County Sol., Dennis Biondo, Asst. County Sol., Pittsburgh, Pa., for defendants.

## OPINION

COHILL, District Judge.

### I.

### Introduction and Background

#### A. Legal History

This civil rights class action is familiar to us. It began in 1976 when an action previously filed *pro se* by an inmate of the Allegheny County Jail (hereinafter referred to as "the jail" or "ACJ") was combined with a civil rights class action filed by Neighborhood Legal Services on behalf of other inmates under 42 U.S.C. § 1983, and various amendments to the United States Constitution, challenging the constitutionality of various conditions at ACJ. Following a six week non-jury trial in 1977, we filed Findings of Fact and Conclusions of Law, holding that many of the conditions within ACJ were indeed unconstitutional. *See Owens-El v. Robinson,* 442 F.Supp. 1368 (W.D.Pa.1978).

After receiving reports and testimony from an appointed Court Advisor concerning jail conditions and possible remedies and a final hearing, we issued a second opinion on October 11, 1978, ordering various reforms, procedures and changes at the jail. *See Owens-El v. Robinson,* 457 F.Supp. 984 (W.D.Pa.1978). Several portions of the Order were appealed to the Third Circuit Court of Appeals which affirmed for the most part. However, the

Court of Appeals did remand the case for our further consideration of mental health care for inmates. *See Inmates v. Peirce,* 612 F.2d 754 (3d Cir.1979). Following remand, hearings were held, and a third opinion and order were filed on April 17, 1980 wherein we established guidelines and procedures to be followed and various programs to be implemented regarding mental health care. *See Inmates v. Peirce,* 487 F.Supp. 638 (W.D.Pa.1980).[1]

During this period, we made several visits to the jail and retained the Court Advisor for a while to be sure that our orders were being followed. Things seemed to be going pretty well.

In April, 1983, however, some three years after the last order, the inmates filed a motion seeking a rule to show cause why the defendants should not be held in contempt for failure to comply with this Court's Orders of October 11, 1978 and April 17, 1980. The plaintiffs also filed a motion for "additional relief." In both motions, the inmates alleged that not all of the requirements of the court orders were being complied with and that many substandard, unconstitutional conditions which existed at ACJ in 1978 still were extant in 1983.

#### B. Our Visit to the Jail

As we did at the initial hearing in 1977, we heard opening statements from the lawyers and then went to visit the jail (May 5, 1983) without having first advised anyone that we would be doing this. We spent several hours touring the jail and had lunch there.

Our first impression was that the jail appeared to be cleaner than before and that prisoner conduct and morale were better than they had been in 1977. Another problem has arisen, however, over which no county official has control—overcrowding.

Ironically enough, in the first opinion we had said: "Overcrowding of the institution is not a problem. In 1975 the average daily population was 429." 442 F.Supp. at 1376.

---

1. Because we will frequently refer to the four jail opinions, we will henceforth simply use the citation: 442 F.Supp. at ——; 457 F.Supp. at ——; 612 F.2d at ——; and 487 F.Supp. at —— when referring to them.

*The jail is now dangerously overcrowded. Fires and prisoner unrest are an ever-present danger in any penal setting. Here they could result in disaster. The Allegheny County Jail is a catastrophe waiting to happen.*

### C. *The Hearing*

We conducted a six-day hearing in connection with these petitions. At the close of the plaintiffs' case, we granted the defendants' motion to dismiss the petition for the contempt rule, holding that there was insufficient evidence to support a finding of contempt. We denied, however, defendants' motion to dismiss the plaintiffs' request for additional relief because we believed that the plaintiffs had made an adequate showing that the defendants were not in compliance with certain portions of our orders and that additional relief might be warranted.

### D. *Format of Findings of Fact and Conclusions of Law*

We now enter Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure on the motion for additional relief.

As we did in our first opinion (442 F.Supp. 1368), we will depart from the traditional format used in organizing Findings of Fact and Conclusions of Law. Such a format would be confusing and burdensome in this instance since so many subject areas are under consideration. Therefore, we will divide this opinion into various sections, first considering possible violations of the Order of October 11, 1978 and, secondly, violations of the April 17, 1980 Order.[2] Last, we will discuss the recent problem of overcrowding.

### II.

### *Powers of the Court*

Inherent in the powers of a United States District Court is the equitable power to mold previous orders and correct wrongs which continue to persist. *Swann v. Charlotte Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); 457 F.Supp. at 985. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold such decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944). As times change, remedies fashioned in a particular case may require alterations, modifications or additional reinforcement. Equitable remedies are not chiseled in stone. As a court with equitable powers, we must remain willing to amend orders where justice requires it.

With this principle in mind, we will proceed to review our previous orders in light of the present facts.

### III.

### *Violations of the Order of October 11, 1978*

In 1978, we ordered many changes at ACJ. Such changes ranged from requiring a specific number of guards to be stationed in cell blocks (Paragraph 1) to ordering the establishment of a building evacuation plan (Paragraph 29). Prior to ordering these changes, we issued Findings of Fact, describing, *inter alia,* the physical layout of ACJ, the number of employees, the medical facilities, and the various procedures employed in ACJ for the care and discipline of inmates.

When we entered the Order of October 11, 1978, conditions were deplorable in almost every area of the jail; immediate action in correcting the situation was required. The current situation is quite different. Though the jail is still lacking in a number of areas, and though we consider the present overcrowding to be unconstitutional, the evidence convinces us that the defendants have generally made good-faith efforts to comply with our previous orders.

---

**2.** In citing our previous orders, rather than referring to page numbers in the Federal Supplements, we will refer to the numbered or lettered paragraphs of the orders. The 1978 order appears in 457 F.Supp. at 988–983. The mental health order appears in 487 F.Supp. at 643–645.

These factors caused us to deny, at the close of plaintiffs' case, the plaintiffs' motion for issuance of a rule to show cause why the defendants should not be held in contempt. We found that the defendants' conduct did not rise to the level of contempt. The defendants have, however, fallen short of full compliance with the 1978 order. As a result, we will look to those portions of the order which have not been met and will only make Findings of Fact with respect to the defendants' deviations from the specific requirements. We see no need to reiterate the Findings of Fact made in 1978. In addition, we hereby incorporate by reference our Conclusions of Law as set forth in the opinions found at 442 F.Supp. 1368 and 457 F.Supp. 984. The law, at that time, supported our finding of unconstitutional conditions and our remedial orders. Therefore, the law will continue to support any changes we may deem necessary in order to enforce our order and maintain minimum constitutional standards.

We note that our opinions and order of 1978 were decided prior to the United States Supreme Court decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). We are mindful of this case and its holding concerning the standard to be applied in prison condition cases involving pretrial detainees. In *Wolfish,* the Supreme Court set forth the Fifth Amendment Due Process standard to be applied in cases dealing with conditions of jails housing pretrial detainees. The Court held that a condition must be found to be imposed for the purpose of punishment rather than serving some other legitimate government purpose before a court may find that it is unconstitutional. *Id.* at 538, 99 S.Ct. at 1873.

Given the conditions of the jail in 1976–1978, we conclude that the *Wolfish* standard would have been met and that the totality of the conditions were unconstitutional. We do not at this time see any need to begin a new legal analysis of ACJ conditions.

## A. Staffing

### 1. Cell Block Guards

Paragraph 1 of the 1978 Order states:

There shall be no fewer than two guards stationed on a full time basis in each occupied cell block of the Allegheny County Jail ("jail") during the hours between 8:00 A.M. and evening lock-up of inmates daily. A separate daily log shall be maintained reflecting the names of the guards stationed in the occupied cell blocks, the specific cell blocks to which they were assigned and the particular hours each of the guards worked in the cell blocks.

We find that the guards have been consistently ordered from the cell blocks to patrol the dining hall, leaving only one guard to a block. This is partially due to overcrowding. Meals are being served almost continuously; therefore, it is rare that two guards are on a cell block at the same time. The logbooks do not reflect these moves. It is vital for security's sake that two guards be stationed on a block during the daylight hours. 442 F.Supp. at 1385.

### 2. Sanitation Officer

The Order of 1978 went into great detail as to the lack of cleanliness at ACJ and the procedures which were to be followed to correct that condition. Paragraph 4 states:

A position of sanitation officer shall be established in the jail. The sanitation officer shall be adequately trained in sanitation procedures. His duties will include supervision of the jail's cleaning and sanitation program and enforcement of sanitation standards throughout the jail. The position shall be established immediately.

Testimony revealed that Officer Richard Pfeifer has been given that position at ACJ, though he is referred to as the detail officer. Though Officer Pfeifer has the necessary title, we find that he has been unable to perform fully the duties which we prescribed in our order.

Through his deposition, the plaintiffs established that Officer Pfeifer had no train-

ing in sanitation procedures, that he is not responsible for the cleanliness of the individual cells and ranges (the areas which comprise most of ACJ), and that his only responsibility as a detail officer is to see that the lower circle (rotunda of the jail), the alleyways and the ranges (aisles) in front of the cell blocks are clean. He seems to have no power to enforce the cleaning programs. When he is not acting in the capacity of detail officer, he relieves officers on their breaks, patrols various areas and supervises taking out garbage. Though called a detail officer, it would appear that Officer Pfeifer more realistically is a corrections officer with additional cleaning duties.

### 3. Supply Officer

Paragraph 14 of the 1978 Order states:
The position of one supply officer for each shift shall be established in the jail. The supply officer shall be responsible for supervising the distribution of the various articles detailed in paragraphs 10, 11 and 12 hereof.

In March, 1981, almost two and one half years after this order was signed, Officer John Harris was appointed as supply officer at ACJ. Officer Harris had experience as a supply officer in the Army. Although he appears to be doing a good job of ordering supplies on time, he is unable to keep close watch over the distribution of supplies because he spends so much of his time away from ACJ. Officer Jones testified that one of his duties is to pick up supplies from businesses which won't deliver and to transport blood samples to local hospitals. As a result, he is not always available at ACJ when supplies are needed. Several inmates and corrections officers testified that they were unable to find Officer Jones when clothes, towels and other supplies were needed. Officer Jones works from 9 A.M. to 5 P.M. Contrary to our order, a supply officer has not been appointed to cover each of the other shifts.

### B. Cleanliness

### 1. Extermination Program

At the time of our first hearing, roaches and rodents were commonplace at ACJ. So

that this condition could be remedied, we ordered that "a vigorous and ongoing insect and vermin extermination program shall be maintained." Paragraph 6. The plaintiffs agree that an extermination program has been implemented at ACJ and that the exterminator comes at least once a week. However, roaches and rodents, though not as prevalent, still live in ACJ.

The testimony revealed two basic reasons for this continuing problem. First, inmates remove food from the dining area and take it to their cells, despite regulations against this. This attracts vermin to various living areas throughout the jail.

A more serious problem, however, is the "BY" (Back Yard) area. The BY area of the jail is located in the center of the structure near the kitchen and the bakeshop. It is a large, open yard where deliveries are made and garbage is left. The manner in which the garbage is stored has created the problem.

Garbage is placed in plastic bags, and the bags are stacked outside the kitchen door. Garbage is not picked up on weekends. There are not enough metal containers for all the garbage. As a result, the bags are easily torn (or eaten into by rats), and garbage is strewn throughout the BY area. Vermin and rodents are thereby attracted. This condition has worsened in the past year or two, as subway excavation commenced near and under the jail. The blasting has caused rodents and vermin to come into the jail. Though the defendants recently contracted with a refuse company to pick up the garbage on weekends, this service had not yet begun at the time of our latest hearing. So long as the garbage is handled in this way, the extermination program will be inefficient.

### 2. Kitchen and Bake Shop

Mr. Joseph Witzel, an environmental health expert from the Allegheny County Health Department, testified to various inspections he made of certain areas within ACJ, including the main kitchen, the bake-

shop, the BY area and the storage room. We note that the defendants themselves requested such inspections by the Health Department although they are not required by state or local law. Mr. Witzel testified that general cleanliness is lacking within these areas, increasing the chances of attracting vermin and rodents. He also stated that, given the current condition of these areas, if this kitchen served the public, it might be shut down if improvements were not made. We find that the general level of sanitation throughout ACJ, and especially within the food preparation areas, needs improvement.

### C. *Inmate Services and Treatment*

#### 1. *Non-Collect Telephone Calls*

Paragraph 16 of the 1978 Order directed that telephones were to be placed throughout ACJ from which collect calls could be made. A "reasonable alternative" was to be provided for inmates to make non-collect calls to such entities as governmental agencies and the Public Defender's Office where collect calls won't be accepted.

In accordance with this order, a substantial number of phones for collect calls have been installed throughout the cell blocks and other areas of ACJ. The collect call system appears to be functioning smoothly.

The "reasonable alternative" for non-collect calls, however, has not fared as well.

In order to make a non-collect call at ACJ, an inmate must make a verbal request to a counselor, corrections officer or staff member (Corporal, Sergeant or Lieutenant) or fill out a written request form stating whom the inmate wishes to call and for what reason. Most of these requests are then given to Ronald C. Markowski, the director of counseling at ACJ. Mr. Markowski reviews the requests and then makes a determination as to whether or not the non-collect call should be permitted. The criterion seems to be whether or not an emergency exists. If he decides that it is an emergency, he allows the call to be made on either the one phone in the counseling office, or from one of the phones in the attorney conference room. Mr. Markowski,

however, is not the only one who approves or disapproves non-collect calls. Testimony established that staff members and sometimes even the warden will rule on such calls.

Under Mr. Markowski's approval system, calls to governmental agencies and lawyers are rarely considered to be emergency calls, though these parties do not usually accept collect calls. The system is too subjective. Mr. Markowski testified that his criteria as to what constitutes an emergency call are neither written nor set forth in such a manner as to aid those who are reviewing the requests to make an objective decision. Karen Miller, a counselor at ACJ, testified at her deposition that Mr. Markowski's system has resulted in fewer requests for non-collect calls, presumably because the inmates believe that it is almost impossible to get a call approved. As for the requests that are made, Ms. Miller stated that few are granted. Ms. Miller further testified that sometimes counselors themselves will call an inmate's lawyer or witness and will relay the inmate's message.

The 1978 Order (Paragraph 16) specifically states: "Telephone conversations may not be monitored by jail personnel." We consider relaying messages by jail personnel to be a form of "monitoring" and therefore, a violation of our order.

■ As stated in our first opinion, an inmate's right to phone calls is to be protected, especially if the call is to a lawyer, bail bondsman or other party who will aid the inmate for preparing for his trial. 442 F.Supp. at 1386. Such a subjective system as to who may or may not make calls and who will or will not approve such calls cannot be said to be a "reasonable alternative."

#### 2. *Restraints*

The use of physical restraints at ACJ is something at which we looked closely in 1978. Understanding that restraints may be necessary in certain situations, we nevertheless urged caution and care in placing any inmate in restraints. 442 F.Supp. at 1380–1381. Paragraph 19 of the Order,

dealing with the use of restraints was explicit and detailed with the intent that this practice would be closely monitored.

One of the requirements of the restraint procedure (Paragraph 19(iv)) is that a separate log must be kept reflecting the use of restraints, the time of approval and the reasons for the restraints. A log exists, but it has not been properly maintained and does not comply with the court order.

Patricia Lewandowski, R.N., a nurse at ACJ, testified at her deposition that there was no restraint log until the early part of March, 1983, after this case was reopened. Prior to March, 1983, Ms. Lewandowski stated that the doctor's restraint orders were recorded on any piece of paper that could be attached to the inmate's chart or file.

Donald P. Breneman, M.D., a psychiatrist and the administrator of the mental health program at ACJ also testified that restraint orders, which included the reasons for the restraints, were written on the inmate's chart. Dr. Breneman testified that a separate log had been maintained, however, he was aware of the difficulty in finding it when it was requested by the plaintiffs in preparation for this hearing.

We are of the opinion that a separate and exact log has not been properly kept since our order. It is true that the restraint orders and reasons therefore are kept in the inmate's chart, and we have no quarrel with that procedure. However, we believe it is of vital importance that a separate, independent, accurate log be preserved to which anyone can refer, such as corrections officers, staff members or anyone else at ACJ who might not have access to the medical charts but would have a legitimate interest in the use of restraints. The log should afford individuals information concerning the use of restraints.

Paragraph 19(i) of the Order provides that "[i]nmates requiring restraints will be housed only in a hospital setting and only on regular beds with a mattress, clean sheet or mattress and blanket."

When we made that order, we were speaking only of the use of restraints on male inmates since the conditions related to female inmates were not at issue. However, we have now been asked to view the conditions of restraints as they apply to the female population.

The female inmates with mental health or disciplinary problems are housed on A Range within the female section of ACJ. The A Range holds eight cells. One of the cells is known as the "glass" or "plastic" cell. It is a cell in which there is only a perforated metal cot and a toilet enclosed in a metal closet. In front of the bars is a plexiglass shield. The only light within the glass cell is the light from the outside hallway. This cell is used for women who are possible suicide victims, violent or those whom the medical staff believes need close attention.

The cot within the cell is attached to the wall. It is a large sheet of metal with holes the size of a fifty cent piece scattered throughout. On both sides of the metal cot are handles to which arm and leg restraints can be attached. A mattress may be placed on the metal sheet.

The plaintiffs raised questions in this case about the use of this cell and cot. Through testimony of a female inmate who voluntarily helped care for other women in this cell and from a female corrections officer, we find that some women inmates have been partially or totally stripped of their clothing and placed in restraints on this metal cot without a mattress. Their only covering was a blanket which would frequently fall to the floor. Bed pans were sometimes used because some of these women were not released from the restraints to use the toilet facilities. Some women occasionally lay in their own waste. Such uses are not consistent with the 1978 Order. We see no reason why an inmate, male or female, should be restrained without clothes or a mattress. If they are in restraints they obviously cannot tear at their clothes or use them for suicide purposes.

We realize that there are occasions when restraints are a life-saving necessity, but

such occasions must be kept at a minimum, closely monitored and utilized as humanely as possible.

### 3. Supplies

Paragraph 10 of the 1978 Order provides that "[u]pon admission to the jail each inmate shall be provided with a clean towel, clean sheet and clean blanket ... [T]here shall be a sufficient number of towels available ... in the jail's bathhouse." Paragraph 11 provides that inmates without adequate clothes shall be furnished such clothes within 24 hours of admission. Upon admission, an inmate is also to be given soap, a toothbrush and toothpaste. Throughout the past two to three years, these supplies have not been distributed as ordered. Distribution has been uneven at best and non-existent at worst.

Shortages of supplies, especially towels, the occasional unavailability of the supply officer and the dramatic increase in jail population have resulted in violations of our order. While this portion of our order has not been totally observed by the defendants, we believe that at the moment it is not a drastic problem. The defendants must keep a closer watch on their system of obtaining, maintaining and distributing supplies.

### 4. Male Isolation Cell

The use of the male isolation cell, like the use of restraints, was something which caused us to draft in 1978 a detailed order regarding the procedure to be followed. Paragraph 24(ii) states:

Inmates who are placed in the isolation cell shall not be stripped of their clothing; however, their shoes and belts may be removed in the interest of their personal safety.

The plaintiffs contend that the defendants have not complied with our order. Specifically, they alleged that, in violation of the order, inmates are stripped to their underwear when being placed in the cell.

We find that inmates are being stripped to their underwear when placed in the isolation cell. In 1978, we were appraised of the risks of suicide, and this is why we permitted belts and shoes to be removed. Current testimony reiterated the possibility of suicide among those placed in the isolation cell. However, we were aware of that fact in 1978, and we still believe that the removal of belts and shoes is all that is necessary unless the log reflects that the doctor is of the opinion that the inmate should be stripped to his underwear.

### 5. Law Library

Courts have long held that inmates have a constitutionally protected right to have access to a law library. Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). As a result, in 1978 we ordered that a law library be maintained at ACJ. Paragraph 27 of the order stated that this library "shall be available for daily inmate use." As previously mentioned the order was directed only to conditions affecting the male population. In the case at hand, the plaintiffs have called our attention to certain aspects of the women's quarters.

On our recent tour of the jail, and through testimony of a female inmate, we learned that the female inmates at ACJ do not have their own law library, nor do they have access to the law library located in the male section of the jail.

This constitutional right must apply equally to both sexes and, therefore, the women at ACJ may not be deprived of access to a law library.

### 6. Laundry Services

In 1978, one of the more significant problems at ACJ was the laundry service. Inmate laundry workers were charging a fee (usually in the form of cigarettes) to do other inmates' laundry. With that in mind, Paragraph 15 of the 1978 Order states:

Free personal laundry service shall be provided to all inmates at least once a week. The defendants shall devise a system to prevent inmate laundry workers from charging a fee for laundry services. Said plan shall also describe in detail the

operation of the laundry service and shall be prepared by January 1, 1979.

In the case at hand, the plaintiffs argue that the plan which was created by the defendants is not effective. According to the plaintiffs, inmates are still being charged for laundry services.

The plan, to which the plaintiffs refer, is that the laundry officer and one of the inmate workers go to each range and pick up the laundry. The laundry is placed in a mesh bag and tagged with the owner's name. The inmates come down to the laundry room in the afternoon to pick up their clean clothes. The clean clothes are handed to the owner by one of the inmate laundry workers. The officer in charge is stationed nearby.

We find that this system is generally working. However, there was some evidence that some inmates may still be charged for laundry service. In order to remedy this problem an officer should be required to be with any inmate worker who has contact with the other inmates, both when the laundry is picked up and when it is returned. At no time should an inmate worker be alone with other inmates while these transactions occur.

### D. Conclusion

Although the plaintiffs introduced testimony and evidence relative to several other sections of the order they believed were violated, we have only discussed the portions of the order which we found to have been violated.

We believe that the defendants have made efforts since this case was reopened, to remedy many of the problems mentioned by the plaintiffs. We have decided that these conditions must be monitored for the indefinite future and not merely improved when the pressure of a lawsuit occurs.

### IV.

### Mental Health Order of April 17, 1980

When we wrote our first opinion in January, 1978, we felt compelled to comment on the lack of mental health facilities at ACJ. Although we believed that such facilities were desperately needed, we were of the opinion that ordering the creation of mental health facilities was beyond our power. 442 F.Supp. at 1381–1382.

Upon appeal to the Third Circuit, the plaintiffs argued that it was within our power and that we should order psychiatric care at ACJ. The Third Circuit remanded, 612 F.2d at 763, and we used the opportunity to order the implementation of a mental health program at ACJ. 487 F.Supp. 638.

The April 17, 1980 Order outlined the various procedures to be followed within the program. Though this order has withstood the test of time better than the order of 1978, we still find that the defendants have failed to comply with it in all respects.

We will only mention those sections of the order which we hold were violated. In so doing, we adopt the Conclusions of Law found in our Opinion at 487 F.Supp. 638 and again, rely upon our equitable powers to mold, modify and enforce the original order.

### A. Staffing

In considering the Mental Health Unit ("MHU") where mentally disturbed inmates are kept, we ordered that at least one guard and one nurse be assigned to the unit for each shift. Section II, Paragraph C.

In the recent hearing, several nurses, a psychiatric aide and Dr. Breneman, the administrator of the Mental Health Program, testified that, due to a shortage in nurses, a nurse, though technically assigned to the MHU, is unable to spend more than 4 to 5 hours per shift within the MHU (which presently includes E and F Ranges of the Receiving Unit in order to house the mental health overflow). On the 7–3 shift, three nurses are to work in the jail. From 3–11, two nurses are on duty. The 11–7 shift has only one nurse covering the entire jail. Even though six nurses are scheduled to work per day, during ten months out of the year, less than six nurses actually work due to vacations, illness, and the like. As a result, each nurse has numerous duties to perform throughout the jail. The consequence is that the nurse assigned to the

MHU is unable to be there on a full time basis.

We are aware of the problems the defendants have had in recruiting and keeping nurses at ACJ. We are sympathetic but will not permit these problems to excuse the fact that a nurse is not stationed on a round-the-clock basis within the MHU. The inmates housed within the MHU and the E and F Ranges have been diagnosed as psychotic, withdrawing from alcohol or drugs, suicidal and suffering from other various mental illnesses. These inmates need constant care and attention. Though a guard who is stationed within the MHU on a full time basis can observe and prevent any disturbances, he cannot give the same professional care and supervision that a trained registered nurse can give.

### B. Commitment Proceedings

Part I, Paragraph E of the 1980 Order provides: "If qualified medical personnel at the jail determine that an inmate should be transferred to a mental health institution ... appropriate proceedings shall be instituted within 72 hours of the decision." The plaintiffs allege that this is not being done.

When an inmate comes into the jail, and it is determined that commitment proceedings are indicated, what next occurs depends upon the legal posture of the inmate. If the inmate is charged with a felony, the inmate is referred to the County Behavior Clinic which may see that that person is taken to one of the state penal institutions for the criminally insane. If, however, the inmate is charged with a summary offense, the Behavior Clinic is not notified. The County Mental Health/Mental Retardation Agency ("MH/MR") is contacted, and civil commitment proceedings may be instituted under the Pennsylvania Mental Health Procedures Act, 50 Pa.C.S.A. § 7101, et seq. Pursuant to this act, a hearing is held before a judge, and testimony is taken. The judge then decides if commitment is warranted. See 50 Pa.C.S.A. § 7304(c).

The testimony in this case established that commitment proceedings are rarely instituted by ACJ personnel for two basic reasons: first, they allege that a witness must be able to testify to dangerous behavior outside of the jail of which the witness has first hand knowledge. This, the defendants argue, is difficult to do. Secondly, a lack of qualified people within the jail who would be able to initiate commitment proceedings has resulted in a policy that jail personnel will not assist in civil commitment proceedings. As a result, in the past twelve months, of the 100 inmates eligible for civil commitment who were referred to MH/MR, only one was committed.

We accept the defendants' argument that the practical problems they face make civil commitments difficult. Nevertheless, we must find that the defendants have violated our order. In balancing the violation against the problems encountered, we are unable, at this time, to determine how the violation should be remedied. We will therefore direct the defendants to present a formal petition containing a plan to remedy the civil commitment problem.

### V.

### Overcrowding

When we first considered the conditions and problems at ACJ in 1978, we noted, thankfully, that overcrowding was not one of them. See 442 F.Supp. at 1376. Times have changed.

Society, in the past five years, has become crime-conscious; Allegheny County is no exception. Mandatory sentences, harsher sentences, sentencing guidelines, more probation violations and higher bail bonds are all examples of how society and the legal system are attempting to deal with increased crime rates. Citizens have become critical of the judiciary and law enforcement officials. As a result, state legislatures have promulgated laws controlling and increasing penalties to be imposed by the courts, and judges themselves are issuing harsher sentences.

The Pennsylvania Legislature, joining a number of other states, recently enacted mandatory sentences for such offenses as drunk driving and committing a crime with a firearm. See 75 Pa.C.S.A. § 3731 (enact-

ed January 14, 1983) and 18 Pa.C.S.A. § 6103. Because of this philosophy, many of our jails and other detention facilities are swollen far beyond their capacities. ACJ certainly has not escaped this recent phenomenon, and the end is not in sight.

The jail was built in 1882, in the center of downtown Pittsburgh, Pennsylvania. Reflecting the architecture of that period, its massive stone walls, foundations and turrets consume a city block. The foundation stones are so huge they do not even have mortar in the joints. In its early years, the jail was used as a traditional "lock-them-up" detention center. One area, now occupied by the attorneys' visiting room, used to be where condemned prisoners were hanged.

Over time, the jail's uses have multiplied. Today, it is used primarily for pretrial detainees; however, it also houses a small number of convicted federal and state prisoners awaiting sentence, assignment or transfer, state prisoners serving short sentences and federal and state prisoners scheduled to testify at other trials.

In 1975, the average daily population at ACJ was 429. 442 F.Supp. at 1376. The average daily population for this year of 1983 has been 690. On the day of our tour, May 5, 1983, the morning count was 705.

Before we begin an analysis of the problem of overcrowding, it should be helpful to set forth the areas within the jail which are presently being used to house inmates. The cells available for males fit into two categories—those available for general population and those reserved for some specialized use. The male housing areas within the jail, their dimensions and the maximum number of inmates who can be placed within those areas are as follows:

Male Quarters

| Area | Cells | Inmates |
|---|---|---|
| North Block (8' x 5' each) | 47 | 47 |
| West Block (7'8–1/2" x 6' each) | 198 | 198 |
| East Block 238 cells less 45 cells used for administrative or punitive segregation) (7'8–1/2" x 6' each) | 193 | 193 |
| Sub-total | 438 | 438 |
| Cells and areas not available for General Population: | | |
| East Block (cells for Administrative or punitive segregation) (7'8–1/2" x 6' each) | 45 | 45 |
| Summary I (Mental Health Unit - "MHU") (8'10–1/2" x 7'1–1/2" each) | 20 | 20 |
| Summary II (Double-bunked culinary workers) (8'10–1/2" x 7'1–1/2" each) | 20 | 40 |
| Receiving Center (For new admittees and up to 14 cells for MHU overflow) (7'7–1/2" x 6'1–1/2") | 63 | 63 |
| Sub-total | 148 | 168 |
| Total | 586 | 606 |

|  | Male Quarters | |
| --- | --- | --- |
| Area | Cells | Inmates |
| Make-Shift Areas: | | |
| Gymnasium (45′10″ x 63′) | 52 cots | 52 |
| A hospital room (19′ x 31′6″) | 9 double | 18 |
|  | — bunks | — |
|  | 61 | 70 |

The female section of ACJ is, perhaps, even more dangerously overcrowded than the male section. There are only 24 cells, and there have been as many as 78 women in that section:

|  | Female Quarters | | |
| --- | --- | --- | --- |
| Area | Cells | | Inmates |
| A Range (10′10″ x 6′ each) | 8 | | 8 |
| B Range (9′11″ x 6′10″ each) | 7 | (6 are double-bunked) | 13 |
| E Range (7′9″ x 6′6″ each) | 9 | (5 are double-bunked) | 14 |
|  | | Sub-total | 35 |
| Make-Shift Areas: | | | |
| Female Hospital (17′11″ x 16′4″) | 6 | double bunks | 12 |
| Female Sewing Room (16′8″ x 24′10-1/2″) | 8 | double bunks | 16 |
| Female Class Room (16′6″ x 25′2″) | 9 | double bunks | 18 |
|  | | Sub-total | 46 |
|  | | Total | 81 |

See Defendants' Exhibit 83–L.

The male cells which are double-bunked, while not ideal, are marginally acceptable. Only 20 cells are double-bunked in the male area. Those cells are in the Summary II unit, a unit built in 1975 which is relatively clean and well-lighted. The men who live in this area work in the kitchen and the bakeshop—so-called "culinary workers." They are interviewed and appraised of the double-bunking situation before being voluntarily placed there.

The 11 cells in the women's section that are double-bunked are not as large or as modern as the double-bunked men's cells. However, they are still marginally adequate in our estimation.

The problem created by the overcrowding is not the double-celling; rather it is the extremely crowded dormitory conditions and the use of mattresses and blankets on the floors of the ranges in the male receiving unit. We will review the facts separately as they relate to each living area.

### A. Dormitory Living

#### 1. Males

Seventy men are currently housed within the general population area in dormitory fashion. Make-shift areas have been created at the expense of other jail activities. The only large, open areas available were the gymnasium and the male hospital.

The gymnasium, which measures 45′10″ × 63′ presently holds 52 single cots. (On the day of our tour, 48 inmates were housed in the gym.) Approximately 12 inches of space is between each cot. Additional space is left around the perimeter of the room to be used as a walkway and as a place for the jail's boxing team and other inmates to run, since there is no other recreational or exercise area within the jail. This area, however, could conceivably be used for beds should the necessity arise. The lights are

left on in the gymnasium 24 hours a day for security purposes. The inmates complained of the noise in the gym.

The 52 inmates who sleep in the gymnasium are required to use the bathroom facilities off of the weight-lifting room. Within these facilities is one toilet and a shower room with nine shower heads.

Eighteen men are living in a male hospital room. This room, measuring 19′ × 31′6″, holds 9 double bunks. It also continues to house ill inmates who need to be placed in a hospital setting, as well as population overflow.

### 2. Females

During our visit in 1977, the female area of the jail was one of its few bright spots. Now, the female dormitory living conditions are deplorable. The female section of the jail is quite small due to the fact that when it was constructed few women inmates were expected. There are only 24 cells within the women's section. Eight cells are reserved for the mentally ill and disciplinary problems.

The female section has housed recently as many as 78 inmates.

In order to accommodate so many, the women's hospital, sewing room and classroom have all been converted into dormitory sleeping areas. This leaves the women with a small television room and a tiny dining area for "open" space. There is absolutely no room for activities such as sewing, classroom work or exercise.

The female hospital measures 17′11″ × 16′4″. Six double bunks are within that area. One toilet and one shower are available for these women.

The old classroom is 16′6″ × 25′2″. Eighteen women are double-bunked in this room. Next to the classroom is the women's sewing room which has the dimensions of 16′8″ × 24′10½″. Squeezed into that room are 8 double bunks, with 15 inmates on the day of our visit. The thirty-three women in these two rooms share two toilets.

Female prisoners are literally crammed into the classroom and sewing room. There is little space between the bunks. The air within the women's section is stifling; ventilation is non-existent. Although the day of our tour was not cold, an electric space heater was on in the television room. In addition, there is no place for these women to enjoy any privacy. The two general sitting areas, the television room and the dining area are small and afford no opportunity for quiet or solitude. The women's living arrangements are abnormal, unhealthy and uncomfortable.

In most of these rooms there is only one exit. It does not take an expert on fires to recognize the fact that if there were ever a mattress or blanket fire in a bunk near the exit, everyone in the room would probably perish.

### B. Male Receiving Unit

Almost as shocking as dormitory conditions at ACJ is the situation within the male Receiving Unit, sometimes referred to as the "SHU" (Selective Housing Unit).

Section I, Paragraph D of the Mental Health Order provides:

> There shall be established within the jail a reception and screening center where all new admittees will be seen by appropriate jail personnel, including a nurse, and where a medical and psychiatric history shall be taken. All new admittees to the jail shall be housed in the reception unit for a minimum of 48 hours following admission.

This 48 hour screening process has proven to be quite successful in preventing suicides and other psychological catastrophies within the general population.

Sixty-three cells on 9 ranges, along with counseling offices, comprise the Receiving Unit. Twelve of these cells have always been used to house inmates requiring high security—murderers, condemned prisoners and violent offenders. On the day of our visit there were twenty-two convicted murderers in the jail. Prior to the increase in population, the remaining cells were used for new inmates. Since the overcrowding

began, the MHU has become full, and 14 cells within the Receiving Unit have been converted into an area housing the MHU overflow. As a result, only 37 cells are now available for new admittees.

The cells within this unit are small and antiquated. They measure $7'7\frac{1}{2}'' \times 6'1\frac{1}{2}''$, which equals approximately $42\frac{1}{2}$ square feet. Within each cell is a cot which is suspended from the wall by chains, a toilet and a sink. The fixtures leave little open space for moving about. These cells, like most of the rest of ACJ, were built in 1882 and little remodeling (aside from new toilets) has occurred. They are made of stone blocks and steel; not one of the cells has a window.

Constantly, in the past two years, the daily average population in the Receiving Unit has been higher than the number of cells available. This overflow has been forced to sleep on the ranges (aisles) in front of the cells. Several guards and inmates testified that a number of the inmates who had to sleep on the ranges had no cot and slept directly on the cement floor with only a blanket. Even a guard who was called as a defense witness stated that there are inmates sleeping on the floor, and that three or four inmates must sleep on the ranges per night, either with only a mattress or blanket.

Though the witnesses for each side disagreed as to the number of times inmates slept directly on the floor without a mattress, both sides agreed that it is a common, everyday occurrence to have inmates sleeping on mattresses on the floor throughout the ranges in the Receiving Unit. Staff members and guards testified that mattresses were confiscated from inmates who had cells with cots, and these mattresses were then given to the new admittees to be placed on the floor. Some inmates have been fortunate enough to receive a folding army cot. Others receive the steel frame of a single bed; however, a mattress is not always available, and the inmate must sleep on the metal springs.

Not only are the ranges being utilized for sleeping space, but the stainless steel con-ference tables within the Receiving Unit are sometimes used as beds. Mattresses and blankets have been placed on these tables upon which inmates sleep.

The only toilet facilities within the Receiving Unit are in the individual cells. Therefore, for the inmates housed on the ranges to use the facilities at night, one cell per range is left unlocked. The inmates are told to use the cell's facilities, even though someone is sleeping in there. This situation has caused problems since a number of new admittees are too shy or frightened to use the toilet facilities in another man's tiny cell. As a result, on occasion inmates have used the shower stalls as urinals.

The ranges themselves are not conducive to sleeping. The mattresses, beds and cots leave little space to move. For security reasons, the lights are left on. Cockroaches and mice run through the area, especially at night. The minimum amount of time an inmate must endure these conditions is 48 hours, but many spend a much longer period there. The overcrowding in the general population of the jail leaves little room to which a new inmate can be transferred. Usually they move from the Receiving Unit to the gymnasium and, ultimately, to a cell or a double bunk in the hospital room.

## C. *Additional Problems*

The effects of overcrowding at ACJ are apparent in places other than just the sleeping areas. Shortages in supplies have increased. The psychiatric staff testified that, as the population figure rises, the need for more MHU beds rises. However, space for these beds is nonexistent. As a result, the overcrowding has also caused a "ripple" effect in the MHU. When the Summary I (MHU) unit's twenty cells become full, additional inmates requiring mental health care are moved to the 14 cells in the Receiving Unit which is reserved for MHU overflow.

When these 14 cells are filled, some inmates who really should be in MHU are then moved to general population. This, of course, short circuits our order regarding mental health care at ACJ.

The nursing staff complained that the increase has affected their ability to perform their duties. Too much time is spent on routine duties of giving general physicals and passing out medication, leaving little time for anything else. Three hundred doses of psychotropic drugs were administered to inmates on the day of our visit.

The dining hall must serve 2,300 to 2,500 meals per day (including staff), resulting in continuous work for the kitchen workers and overuse of kitchen equipment. Staffing is inadequate for the number of inmates. Inside recreational facilities no longer exist since the gymnasium was converted into a dormitory. Security is less effective. On any given day, of course, a number of cells will be "down", that is uninhabitable and in need of maintenance. Plumbing, toilets and washbasins that don't work are a constant problem. All of these problems have been caused or aggravated by the overcrowded conditions, and, unfortunately, an end is not in sight.

William B. Robinson, a prior warden at ACJ, who has over thirty years of experience in corrections and is now the Executive Director for the Allegheny County Prison Board, testified that he has been concerned about the increase in population at ACJ for a long time. He believes that the problem will get worse. It is his opinion that the average daily population in the next twelve months will be 750–800. He predicts the average daily population will increase by 250 inmates by 1990. This will mean an average daily population of 940 compared to the current 690.

He stated that, given the age and the condition of ACJ, the maximum number of inmates which should be housed within the jail is 475–500 males in the main population, 63 in the Receiving Unit and 30 in the female section.

Warden Charles J. Kozakiewicz, a defendant in this case, as is Director Robinson, echoed Director Robinson's concern. When asked what he believed the *optimum* number of inmates should be, the Warden responded that the *manageable* number is 400–525 males and 25–30 females.

### D. Conclusions of Law

Within the last ten years, a number of courts have been faced with the constitutional issue of prison overcrowding and the possible solutions thereto.

One of the first cases considering this problem is *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972), aff'd 501 F.2d 1291 (1974). In *Gates*, the court had to determine the constitutionality of various bad conditions at the state penitentiary, including overcrowding. After holding that many of these conditions violated the Eighth Amendment, the court ordered elimination of all such conditions, including a requirement that plans be submitted for a procedure to reduce population at the penitentiary and to construct a new detention facility. *Id.* at 903–904.

Following *Gates*, several federal district courts held that overcrowding was unconstitutional and ordered jail and prison officials to reduce their populations. *See Miller v. Carson*, 563 F.2d 741 (5th Cir.1977); *Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo.1979), *modified*, 639 F.2d 559 (10th Cir.1980), *cert. denied* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Johnson v. Levine*, 450 F.Supp. 648 (D.Md.1978), *aff'd in part*, 588 F.2d 1378 (4th Cir.1978); *Rutherford v. Pitchess*, 457 F.Supp. 104 (C.D.Cal.1978); *Newman v. Alabama*, 349 F.Supp. 278 (M.D. Ala.1972), *aff'd in part* 503 F.2d 1320 (5th Cir.1974), *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975).

The law in the area of prison conditions and reform remained fairly constant until 1978. In that year, the United States Supreme Court decided *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1978) which considered the constitutionality of detention facility conditions as they relate to pretrial detainees under the Fifth Amendment Due Process Clause.[3] Three

---

**3.** In *Wolfish*, the detention facility under consideration was a federal facility. Therefore, the conditions were analyzed under the Fifth Amendment Due Process Clause. In the case,

years later, the Supreme Court considered the rights of convicted criminals relative to prison conditions under the Eighth Amendment. *See Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Any court deciding issues of constitutionality in prison reform cases should now look to the standards enunciated in these recent Supreme Court decisions.

The majority of inmates at ACJ are pretrial detainees; therefore, we will consider first the standards set forth in *Bell v. Wolfish, supra.*

In *Wolfish,* the court was asked to consider the constitutionality of a number of conditions of confinement and practice at the Metropolitan Correctional Center (MCC), a federally operated short-term detention facility in New York City. Like ACJ, MCC primarily houses pretrial detainees. *Id.,* 441 U.S. at 524, 99 S.Ct. at 1866. Unlike ACJ, MCC is a modern facility, built in 1975. It has no barred, dark cells or steel gates. "It was intended to include the most advanced and innovative features of modern design of detention facilities." *Id.* at 525, 99 S.Ct. at 1866. Each room has a total floor space of approximately 75 square feet. The rooms hold a toilet, wash basin and other furniture. *Id.* at 541, 99 S.Ct. at 1875.

While MCC was still under construction, an unexpected increase in the jail population occurred, leaving no room for new inmates. To resolve this problem, the jail officials replaced the single beds in the rooms and dormitories with double bunks. Double-bunking was one of the conditions the petitioners alleged to be unconstitutional.

█ Before he began analyzing each specific condition, Justice Rehnquist, writing for the majority, set forth the standard under the Fifth Amendment Due Process Clause which must be met before any condition could be held to be unconstitutional.

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of

some other legitimate governmental purpose . . . Absent a showing of expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." (Citations omitted.)

*Id.* at 538, 99 S.Ct. at 1873. In light of this standard, the Court held that "double-bunking," *as practiced at MCC,* was not punishment and therefore did not violate the Fifth Amendment Due Process Clause.

Though the Court held that the overcrowded conditions at MCC were not unconstitutional, Justice Rehnquist broadened the decision by stating,

[w]hile confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record. (Footnote omitted.)

*Id.* at 542, 99 S.Ct. at 1875.

This qualification has been interpreted by several courts to mean that the *Wolfish* court specifically reserved judgment in cases with different facts and that the Court did not rule that double-celling or bunking is, *per se* constitutional. Therefore, if the conditions of a detention facility cause the inmates "to endure genuine privations and hardship over an extended period of time" (*Id.* at 542, 99 S.Ct. at 1875), a court may find overcrowding to be unconstitutional. *See Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981); *McMurry v. Phelps,* 533 F.Supp. 742 (W.D.La.1982); *Union County Jail Inmates v. Scanlon,* 537 F.Supp. 993 (D.N.J.1982). In each of those cases the court held that the specifics of the case

*sub judice,* ACJ is a state facility; therefore we look to the Fourteenth Amendment. The standard, however, is the same.

before it warranted a finding that the overcrowding was unconstitutional.

The *Union County Jail Inmates v. Scanlon, supra,* case is quite similar to the case at hand. There, approximately 57% of the inmates were pretrial detainees. Due to the overcrowded condition, two temporary dormitories were created in the men's recreation areas. The court stated that 60% of the men's recreational area was converted into bed space. Double celling began on the general population tiers. Inmates were allowed out of their cells between 6:00 a.m. and 10:00 p.m., however, there were no open, common areas which the inmates could gather to move about freely. *Id.* at 998. Mattresses were placed on the floor for some inmates who slept there until they were able to be transferred. *Id.* at 1000.

Faced with these conditions, the court looked to the constitutional standard in *Bell v. Wolfish, supra.* Finding that *Wolfish* did not rule that double celling is, *per se,* constitutional, the court distinguished the facts of *Wolfish* and held that, in the Union County Jail the overcrowding was unconstitutional. The court stated,

> In MCC [the jail in question in *Wolfish*], the hardships, if any, which are imposed upon pretrial detainees by double-bunking are mitigated by the unlimited daytime access to the large common areas. In UCJ, the more serious privations are aggravated by the overcrowded corridors, and the lack of meaningful recreation and other necessities. (For the female inmates, there is a lack of any recreation.)

*Id.* at 1005.

The use of floor mattresses was looked upon harshly by the court in the *Union County Jail* case. The court held that that practice alone constitutes punishment without due process. Calling the condition, "unsanitary, dehumanizing and shocking," the court found under the *Wolfish* standard that the use of floor mattresses is unconstitutional. *Id.* at 1004.

In *Rutherford v. Pitchess,* 457 F.Supp. 104 (C.D.Cal.1978) the court also considered the use of mattresses on the floor and stated that "... basic concepts of decency, as well as reasonable respect for constitutional rights, require that [an inmate] be provided a bed." *Id.* at 109. *See also Lareau v. Manson,* 651 F.2d 96, 105 (2d Cir.1981) (the use of mattresses on the floor is "egregious".)

■ In deciding whether overcrowding is unconstitutional within a given setting, it is necessary to look to the "totality of the conditions." *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). *See also Miller v. Carson,* 563 F.2d 741 (5th Cir.1977); *McMurry v. Phelps,* 533 F.Supp. 742 (W.D.La.1982).

■ Whether or not overcrowding is unconstitutional is a matter of degree, and the conditions created and aggravated by overcrowding may constitute punishment and therefore, violate the Due Process Clause.

Problems created by overcrowding include increased idleness because recreational and educational facilities have been converted into sleeping areas; increased noise level; increased psychological problems; a decrease in the ratio of staff to inmates; meals being served constantly; privacy becoming non-existent; mattresses and blankets strewn across floors for people to sleep on; increased fire hazards and increased tensions. *See Johnson v. Levine,* 450 F.Supp. 648 (D.Md.1978), *aff'd in part,* 588 F.2d 1378 (4th Cir.1978). All of these conditions now exist at ACJ. As previously noted, we are particularly concerned about the obvious fire hazards and the increased potential for serious injuries if there should be a riot. All of these problems exist at ACJ.

■ Neither male nor female inmates have any place within the jail for recreation or exercise. Even though the men are released from their cells between the hours of 7:00 a.m. and 8:00 p.m., there is no common area in which they can gather for exercise, educational programs, or recreation. Since the gym has been taken over for a dormitory, the only exercise area is the outside yard. Given the winters and number of rainy days in Pittsburgh, the yard is rarely available. Narrow, crowded corridors and

staircases provide the only "open" spaces in ACJ. This, in and of itself, is an unconstitutional condition. Courts have consistently held that though "[t]he Constitution does not demand sophisticated athletic equipment or an Olympic style gym; it does require that sufficient opportunities be afforded all inmates so they can keep physically fit." *Laaman v. Helgemoe,* 437 F.Supp. 269, 309 (D.N.H.1977); *see also Ramos v. Lamm,* 485 F.Supp. 122 (D.Colo. 1979), *modified* 639 F.2d 559 (10th Cir.1980), *cert. denied* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

The lack of common space for activities in ACJ has caused an epidemic of idleness. With nothing else to do to occupy their time, the men spend their days either sitting on their beds playing cards, sitting on the steps between the tiers or leaning against railings and walls.

Idleness is an even greater problem with women. Because of the tiny section in which they live, there is no place for physical recreation. The classroom and sewing room which once offered some activities have been turned into sleeping rooms.

Privacy is nonexistent in any section of ACJ. Every nook and cranny has an inmate in it. On our tour, we came across an inmate who was sitting in the shower room adjacent to the gymnasium because, he said, it was the only place he could be alone.

"Total lack of privacy, inability to escape from the presence of other inmates and total idleness causes the overcrowded conditions ... to be constitutional deprivation with devastating physical and emotional consequences." *McMurry v. Phelps,* 533 F.Supp. 742, 751 (W.D.La.1982).

Inextricably intertwined with the problem of overcrowding are these problems: shortages in supplies; increased fire hazards; the placement of mentally ill inmates in general population because of the lack of space in the MHU; shortages in staff—both corrections officers and nurses—which increases security risks and the mental health and general medical problems; the placement of mattresses and blankets on the floor; the constant noise; and use of

showers as urinals because of limited toilets. These problems lead us to the inescapable conclusion that the totality of the conditions at ACJ rises to a level of a constitutional violation.

■ In considering the case at hand, in light of *Wolfish* and subsequent cases, we find that the condition of overcrowding at ACJ violates the Fourteenth Amendment Due Process Clause.

The standard set forth in *Wolfish* requires us to first determine whether or not the overcrowding and the conditions it creates are expressly intended to punish. It is clear from the facts that the defendants in this case did not impose these conditions with the intent, express or implied, to punish. The defendants themselves have expressed genuine concern with the dangerous situation at ACJ. These conditions have been thrust upon the defendants.

Since we can find no expressed intent, we must determine whether the overcrowding is the "incident of some other legitimate governmental purpose." *Wolfish,* 441 U.S. at 538, 99 S.Ct. at 1873. We believe the Second Circuit Court of Appeals in *Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981) clearly articulated the only purpose furthered by the condition of overcrowding—economics.

> The only conceivable purpose overcrowding ... serves is to further the state's interest in housing more prisoners without creating more prison space. This basically economic motive cannot lawfully excuse the imposition on the presumptively innocent of genuine privations and hardship over any substantial period of time.

*Id.* at 104.

■ The county's interest in not providing more prison space is obvious in the case at bar. We take judicial notice of the fact that for years Allegheny County officials have proposed, rejected, discussed and haggled over new jail facilities; plans for new buildings have been drawn up; proposals for renovating already existing facilities have been made and rejected; other plans have been delayed in the hope that outside

financial sources of assistance will be uncovered. As a result, the jail remains with us—old, dilapidated and unconstitutionally overcrowded. An economic motive can no longer excuse or be used to justify the conditions imposed on the inmates at ACJ.

Regarding the sentenced inmates within ACJ, we must look to the Eighth Amendment for the standard to be applied.

The Eighth Amendment prohibits punishments which are cruel and unusual. "When conditions of confinement amount to cruel and unusual punishment, 'federal courts will discharge their duty to protect constitutional rights.' (Citations omitted.)" *Rhodes v. Chapman,* 452 U.S. 337, 352, 101 S.Ct. 2392, 2401, 69 L.Ed.2d 59 (1981).

Because ACJ houses very few convicted prisoners, we will not go into a detailed analysis of the Eighth Amendment standards as they apply to the condition of overcrowding. Instead, cited below are a number of overcrowding cases having similar facts and which have already been discussed here. *See Union County Jail Inmates v. Scanlon,* 537 F.Supp. 993 (D.N.J. 1982); *McMurry v. Phelps,* 533 F.Supp. 742 (W.C.La.1982); *Johnson v. Levine,* 450 F.Supp. 648 (D.Md.1978), *aff'd in part,* 588 F.2d 1378 (4th Cir.1978); *Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981).

Even though we have found the overcrowding at ACJ to have violated the constitution, we also believe that this condition impedes the implementation of the 1978 and 1980 orders. Therefore, an order to reduce the overcrowding not only is within our power to correct the constitutional violations, but it also falls within our remedial powers to modify and enforce our previous orders.

We cannot end these Conclusions of Law without noting the Supreme Court's admonition in *Wolfish, supra* and *Rhodes, supra* that the operation and management of a detention facility are usually best left to the prison officials and state legislatures, unless these parties have failed to perform these duties in an adequate manner. We

could not agree more and drafted the 1978 and 1980 orders (both drawn before the *Wolfish* and *Rhodes* decisions) with that in mind. A court cannot and should not impose its own views as to how a particular facility should be run, absent a highly unusual situation. Yet, in the case *sub judice,* the prison officials themselves voiced their concerns over the overcrowding of ACJ and the desire for a reasonable, swift solution. The problem is not going to go away through attrition of the population. All projections and predictions are that the population will increase.

### VI.

*Conclusion*

We are aware that the County Commissioners have announced their intention to construct a new facility which may house up to 320 inmates. This is commendable. Unfortunately we cannot, either constitutionally or in good conscience, permit the existing condition at ACJ to remain any longer. We will order a reduction in jail population over the next few months so that the overcrowded condition will be eliminated.

In addition, we will appoint a Court Monitor to advise this Court of the compliance by the defendants with this order.